773 A.2d 6

# IN THE MATTER OF THE DISTRIBUTION OF LIQUID ASSETS UPON DISSOLUTION OF THE UNION COUNTY REGIONAL HIGH SCHOOL DISTRICT NO. 1, UNION COUNTY.

Argued October 23, 2000—Decided January 30, 2001.

2

*Robert A. Goodsell* argued the cause for appellant Borough of Mountainside (*Post, Polak, Goodsell & MacNeill*, attorneys; *Mr. Goodsell* and *John N. Post*, of counsel).

*Teresa L. Moore* argued the cause for respondent Berkeley Heights Board of Education (*McCarter & English*, attorneys).

*Douglas J. Kovats* argued the cause for respondent Clark Board of Education (*Kenney, Gross and Kovats*, attorneys).

*James P. Granello* argued the cause for respondent Kenilworth Board of Education.

*Michelle Lyn Miller,* Deputy Attorney General, argued the cause for respondent State Board of Education (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Nancy Kaplen*, Assistant Attorney General, of counsel).

*Cherie L. Maxwell* submitted a letter in lieu of brief on behalf of respondent Springfield Board of Education (*Sills Cummis Radin Tischman Epstein & Gross*, attorneys).

*Peter A. Tucci, Jr.*, former counsel, submitted a letter in lieu of brief on behalf of respondents Borough of Garwood and Board of Education of the Borough of Garwood (*Buttermore, Mullen, Jeremiah & Phillips*, attorneys).

*David B. Rubin* submitted a letter in lieu of brief on behalf of respondent Mountainside Board of Education.

The opinion of the Court was delivered by

STEIN, J.

We granted certification to review a decision of the State Board of Education (State Board) ordering distribution of the liquid assets of the now-dissolved Union County Regional High School District No. 1 ("District") to each of the District's six constituent municipalities. The District operated four school buildings and had approximately $3.3 million in liquid assets. Upon dissolution, the District's school buildings and real estate, valued at approximately $110 million, were deeded to their host municipalities.

Petitioner Borough of Mountainside, one of the two municipalities that did not host a District school building, contends that the State Board erred by failing to order distribution of the District's liquid assets only to the municipalities that were not deeded real estate. The Appellate Division upheld the State Board ruling. We reverse and remand the matter to the State Board with instructions to distribute the District's liquid assets in the manner specified in this opinion.

I

Union County Regional High School District No. 1 was established in 1935 by the joint efforts of six municipalities: Clark, Garwood, Kenilworth, Springfield, Mountainside, and Berkeley Heights. The District was a limited purpose school district, serving only high school students. In 1993, the school boards for the six municipalities commissioned a study to consider the feasibility of dissolving the District. Thereafter, five of the six municipalities—all but Garwood—applied to the Union County Superintendent of Schools pursuant to *N.J.S.A.* 18A:13-51, to "make an investigation as to the advisability of the dissolution of the regional district." *Ibid.* Pursuant to *N.J.S.A.* 18A:13-52, Dr. Leonard Fitts, the Union County Superintendent, issued a report in April 1995 that was intended to enable the municipalities to

> form an intelligent judgment as to the advisability of the proposed ... dissolution and the effect thereof upon the educational and financial condition ... of the constituent districts in the event of a dissolution, and setting forth the amount of indebtedness, if any, to be assumed ... by each constituent district in the event of a dissolution....

[*N.J.S.A.* 18A:13-52.]

Dr. Fitts recommended against dissolution. However, in the event that the District was dissolved and the four school buildings and accompanying real estate were deeded to their host municipalities, Dr. Fitts recommended that Mountainside and Garwood alone share all liquid assets, with Mountainside receiving 76% and Garwood 24% based on an October 1, 1994 equalized valuation of

property. The value of the assets each municipality would receive under Dr. Fitts' recommendation is set forth in Table A.

Table A: Union County Superintendent Recommendation for Distribution of Real Property and Liquid Assets

| Community | Real Property (totaling $110 million) | Liquid Assets (totaling $3.3 million) | % of Total Assets | % of 1996-97 Budget Contribution |
|---|---|---|---|---|
| Kenilworth | $24,519,284 | $0 | 22% | 13% |
| Berkeley Heights | $30,214,543 | $0 | 27% | 27% |
| Clark | $30,119,535 | $0 | 27% | 22% |
| Springfield | $25,755,082 | $0 | 23% | 19% |
| Mountainside | $0 | $2,483,160 | 2% | 15% |
| Garwood | $0 | $784,156 | 0.7% | 5% |

Notwithstanding Dr. Fitts' recommendation to the contrary, the five municipalities that favored dissolution petitioned the State Commissioner of Education in May 1995, pursuant to *N.J.S.A.* 18A:13–54, for permission to submit to the legal voters of each constituent district the issue of "whether the regional district shall dissolve." The petition set forth a series of objections to dissolution noted by Dr. Fitts, and provided answers to those objections. Paragraph 31(g) of the petition notes Dr. Fitts' objection that "[t]wo of the six municipalities would not acquire high school buildings of the Regional District." The petition responds by endorsing Dr. Fitts' liquid asset distribution alternative as a method of preserving the equity of the dissolution: "Pursuant to the recommendations contained in the County Superintendent's Report, the two constituent school districts which did not acquire buildings, namely Garwood and Mountainside, would not be responsible for any debt service or liabilities *and would receive all liquid assets of the Regional District.*" (Emphasis added).

As required by *N.J.S.A.* 18A:13–56, the Commissioner of Education submitted the dissolution petition to the Board of Review, which consists of the Commissioner of Education, a member of the State Board, the State Treasurer, and the Director of the Division of Local Government Services in the Department of Community Affairs. *Ibid.* The Board of Review is responsible for determining "whether or not the petition should be granted, and if so, the amount of indebtedness, if any, to be assumed ... by each of the

constituent Districts. . . ." *Ibid.* In its November 1995 letter opinion, the Board of Review granted the petition to dissolve with one condition—that Kenilworth agree to accept Garwood High School students in a sending-receiving relationship if Garwood chose to enter that relationship. The Board noted that the indebtedness of the District—totaling approximately $572,000— would not burden any of the constituent municipalities, and added that it was not "convinced that following the statutory scheme for distribution of assets and liabilities results in an inequity of such proportion as to provide a basis for denying the petition." The Board of Review elaborated on the basis of its decision in an amplification letter issued in December 1995. There, the Board of Review wrote:

> Pursuant to statute, Garwood and Mountainside, because they do not have high school buildings within their municipalities, will not be apportioned any of the equity in the land and buildings. However, any equity that is retained by the four municipalities that hold high school structures is offset by the remaining debt, albeit minimal, to be allocated among the same four municipalities. The Board of Review recognizes that the statutory scheme for distribution does not provide Mountainside and Garwood any share of the equity in these buildings even though the two districts contributed a share of the buildings' construction costs. However, this "loss" of equity is consistent with the statutory scheme and is not significant enough to warrant denying the petition.

Without explicitly rejecting the agreement of the five municipalities to distribute the District's liquid assets exclusively to Mountainside and Garwood, the Board of Review added that the liquid assets would be distributed to each of the six municipalities in accordance with their proportionate property valuations pursuant to *N.J.S.A.* 18A:8–24. That statute provides as follows:

> The county superintendent in a written report filed by him at the end of the school year preceding that in which [the district is dissolved] shall make a division of the assets, except school buildings, grounds, furnishings, and equipment, and of the liabilities, other than the bonded indebtedness of the original district, between the new district and the remaining district on the basis of the amount of the ratables in the respective districts on which the last school tax was levied. . . .
>
> [*N.J.S.A.* 18A:8–24.]

The Board of Review concluded:

> The apportionment of the remaining assets and liabilities, as defined by *N.J.S.A.* 18A:8–24 as those assets other than school buildings, grounds, furnishings, and

equipment, is directly proportional to the amount of local contribution that each of the municipalities has contributed to the regional district. Therefore, each municipality will leave the regional district structure with the same percentage share of these assets as its contribution to them.

On March 8, 1996, Acting Union County Superintendent of Schools David S. Livingston informed the municipalities that the liquid assets would be distributed proportionally to each municipality, in accordance with *N.J.S.A.* 18A:8–24. Livingston added, however, that if the constituent municipalities desired a different allocation of the liquid assets, "it will be necessary for the districts to agree to include this provision in the referendum question," and cited *Egg Harbor Bd. of Educ. v. Greater Egg Harbor*, 188 *N.J.Super.* 92, 456 *A.*2d 106 (App.Div.1982), in support of the proposition that the statutory framework required that procedure.

On May 14, 1996, the referendum passed after a majority of voters in the entire District and in four of the six municipalities voted in favor of dissolution. The ballot included no mention of the distribution of liquid assets. Prior to the referendum, Garwood petitioned the Board of Review to block the referendum, and that petition was denied. Garwood appealed to the Appellate Division, the Appellate Division affirmed, and we denied certification. *In re Petition for Authorization to Conduct a Referendum on the Dissolution of Union County Reg'l High School Dist. No. 1*, 298 *N.J.Super.* 1, 688 *A.*2d 1082 (App.Div.), *certif. denied*, 149 *N.J.* 37, 692 *A.*2d 50 (1997) (*"Union County I"*).

In July 1996, Mountainside wrote to the Commissioner of Education to request that the liquid assets be distributed only to Mountainside and Garwood, as recommended in Dr. Fitts' report and endorsed by the five municipalities in the dissolution petition. By letter dated September 10, 1996, Assistant Commissioner Peter B. Contini declined Mountainside's request. Citing *Egg Harbor, supra*, 188 *N.J.Super.* at 92, 456 *A.*2d 106, Contini wrote that "[i]t is my understanding that without explicit voter authorization of a distribution scheme that is different from that specified in *N.J.S.A.* 18A:13–62 and *N.J.S.A.* 18A:8–24, the liquid assets must be distributed pursuant to the statutory scheme." Because

"no agreement was reached by the constituent districts to specifically include such language in the referendum question," Contini concluded, "the county superintendent will distribute the assets pursuant to the statutory scheme." Contini acknowledged the original recommendation of Dr. Fitts regarding the distribution of liquid assets, but declined to heed Dr. Fitts' recommendation because "the Board of Review never specifically adopted or authorized implementation of that recommendation." Contini also noted Livingston's March 1996 memorandum, and concluded by citing *Egg Harbor* for the proposition that "[s]ince the referendum did not include an explicit provision that identified a different distribution scheme, the districts are bound by the statutory scheme."

In view of Contini's position, Mountainside formally petitioned the Commissioner of Education to distribute the liquid assets only to Mountainside and Garwood. Among other claims of error, Mountainside argued that the Assistant Commissioner incorrectly interpreted *Egg Harbor* as requiring that the ballot question include information about the liquid assets. Mountainside challenged as inequitable the Assistant Commissioner's decision to distribute liquid assets to municipalities that already had been given title to the District's real property, citing the 1995 petition's statement that only Mountainside and Garwood would receive the liquid assets as evidence that all six municipalities intended that result.

Commissioner of Education Leo Klagholz reaffirmed the substance of Assistant Commissioner Contini's letter in a ruling dated May 5, 1997, and dismissed Mountainside's petition pursuant to *N.J.A.C.* 6:24-1.9 (authorizing Commissioner to dismiss petition outright prior to transmittal of pleadings to Office of Administrative Law "on the ground that no sufficient cause for determination has been advanced, lack of jurisdiction, failure to prosecute or other good reason."). Relying on *Egg Harbor, supra,* 188 *N.J.Super.* at 92, 456 *A.*2d 106, the Commissioner held that "no method of distributing assets other than that set forth in statute [sic] may be implemented in the absence of such method having been

included in the referendum question posed to the voters of the regional District, an action which undisputedly did not occur herein and cannot be imputed retroactively to the will of the voters."

Mountainside appealed to the State Board. Mountainside also petitioned the Commissioner to stay the distribution of the $3.3 million in liquid assets, claiming that it would suffer irreparable harm if the funds were distributed. The Commissioner rejected that request, stating that a financial remedy would redress any harm. On June 30, 1997, the new Union County Superintendent of Schools, Frances Lobman, issued a report specifying the final division of assets and liabilities of the District, as required by *N.J.S.A.* 18A:13–62. Following Acting Superintendent Livingston's March 8, 1996 memorandum, the report divided the District's liquid assets proportionally to each municipality in accordance with *N.J.S.A.* 18A:8–24. The liquid assets and real property were ultimately distributed as reflected in Table B.

Table B: Actual Distribution of Real Property and Liquid Assets[1]

| | Real Property (totaling $110 m.) | Liquid Assets (totaling $3.3 m.) | Total Value of Assets Received from Dissolution | % of Total Assets | % of 96-97 Budget Contribution |
|---|---|---|---|---|---|
| Kenilworth | $24,519,284 | $417,757 | $24,937,041 | 22% | 13% |
| Berkeley Hts | $30,214,543 | $881,374 | $31,095,917 | 27% | 27% |
| Clark | $30,119,535 | $719,353 | $30,838,888 | 27% | 22% |
| Springfield | $25,755,082 | $612,598 | $26,367,680 | 23% | 19% |
| Mountainside | $0 | $483,973 | $483,973 | 0.4% | 15% |
| Garwood | $0 | $152,260 | $152,260 | 0.1% | 5% |

The State Board modified and affirmed the decision of the Commissioner dismissing Mountainside's petition. The State Board determined that, contrary to the Commissioner's opinion,

[1] The four communities that received real property shared responsibility for $300,000 in debt, thereby reducing the value of the assets each received by approximately $75,000.

the Appellate Division's decision in *Egg Harbor* did not bar an alternative method of distributing the liquid assets in the absence of a submission of that issue to the voters in the referendum question. Nevertheless, the State Board upheld the dismissal of Mountainside's petition, concluding that "[n]othing presented to us in this case reflects that application of the statutory scheme to the division of liquid assets involved here would result in an inequity such as to provide a basis for denying the finality of the resolution of this issue that is embodied in the Board of Review's determination." The State Board relied heavily on the earlier disposition by the Board of Review, finding that "there is no indication in the record that the Board of Review intended a departure from the statutory method for distributing the assets at issue" and noting the absence of the liquid asset issue from the ballot question. The State Board also questioned its own jurisdiction over the appeal, noting that previous appeals of judgments of the Board of Review had been filed directly with the Appellate Division, and that the "character of the composition" of the Board of Review made direct appeal to the courts a more appropriate mechanism for review.

Mountainside appealed the State Board's decision to the Appellate Division, and the Appellate Division summarily rejected Mountainside's claims of error in an unpublished opinion. We granted certification. 164 *N.J.* 189, 752 *A.*2d 1291 (2000).

## II

Mountainside seeks judicial review of a decision by the State Board. In reviewing executive agency actions, we are guided by well-settled principles flowing from the doctrine of separation of powers. The "fundamental consideration" in reviewing agency actions "is that a court may not substitute its judgment for the expertise of an agency 'so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable.'" *Williams v. Dep't of Human Servs.*, 116 *N.J.* 102, 107, 561 *A.*2d 244 (1989) (quoting *Dougherty v. Dep't of Human Servs.*, 91 *N.J.* 1, 12, 449 *A.*2d 1235 (1982)). That principle of deference

applies to policymaking and fact-finding, and to a lesser extent to statutory interpretation by an agency. *Nelson v. Board of Educ.*, 148 *N.J.* 358, 364, 689 *A.*2d 1342 (1997) ("The interpretation of a statute by the administrative agency charged with its enforcement is entitled to great weight."); *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 *U.S.* 837, 844, 104 *S.Ct.* 2778, 2782, 81 *L.Ed.*2d 694, 703 (1984) ("[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"). Referring to the State Board, we have held that " 'the ultimate administrative decision-maker in reviewing . . . school matters is the State Board, whose final decision will not be upset unless unreasonable, unsupported by the record or violative of the legislative will.' " *Nelson*, 148 *N.J.* at 364, 689 *A.*2d 1342 (quoting *Capodilupo v. Board of Educ.*, 218 *N.J.Super.* 510, 515, 528 *A.*2d 73 (App.Div.), *certif. denied*, 109 *N.J.* 514, 537 *A.*2d 1300 (1987)). We are, however, "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue," *Mayflower Sec. Co. v. Bureau of Sec.*, 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973), and we will intercede if the agency's action exceeds the bounds of its discretion. *In re Taylor*, 158 *N.J.* 644, 657, 731 *A.*2d 35 (1999) (noting that "an appellate court's review of an agency decision is not simply a *pro forma* exercise in which [the court] rubber stamp[s] findings that are not reasonably supported by the evidence"); *L.M. v. State Div. of Med. Assistance and Health Servs.*, 140 *N.J.* 480, 490, 659 *A.*2d 450 (1995) ("When an agency's decision is manifestly mistaken . . . the interests of justice authorize a reviewing court to shed its traditional deference to agency decisions.").

## A

In order to address the merits of this appeal, it is first necessary to resolve the somewhat enigmatic procedural posture in which the case has been presented to us. As noted, the State Board reached the merits of Mountainside's appeal, but also questioned its jurisdiction to hear the appeal because the appeal generated from the Board of Review. We agree that the Commis-

sioner of Education and State Board do not have jurisdiction to hear appeals from the Board of Review.[2] However, the State Board did have jurisdiction over Mountainside's appeal because, as will become clear, Mountainside's appeal was from a decision of the Union County Superintendent of Schools and not from the Board of Review's determination.

The authority of the Board of Review is "closely circumscribed" by statute. *Union County I, supra,* 298 *N.J.Super.* at 7, 688 *A.*2d 1082. Pursuant to *N.J.S.A.* 18A:13–56, the Board of Review is empowered to determine "whether or not the petition [for dissolution] should be granted, and if so, the amount of indebtedness, if any, to be assumed ... by each of the constituent districts...." *Ibid.* The statute directs the Board of Review to "consider the effect of the proposed withdrawal or dissolution ... upon each of the constituent districts," and then to either grant the petition, oppose the petition, or request that if the petition is granted, "the amount of debt which ... any of the constituent districts ... would be required to assume" be reduced because of one or more of three enumerated factors. *Ibid.* In addition, the Administrative Code authorizes the Board of Review to "include in its final determinations required by *N.J.S.A.* 18A:13–56 ... any specific conditions under which its consent is granted in order to insure that a thorough and efficient system of public schools will be maintained in the withdrawing district(s) or municipality(ies) and

---

[2] The Board of Review consists of members of several executive agencies, including the Commissioner of Education, a member of the State Board, the State Treasurer, and the Director of the Division of Local Government Services in the Department of Community Affairs. *N.J.S.A.* 18A:13–56. Given the interagency composition of the Board of Review, it would be peculiar if decisions of that board could be appealed directly to the Commissioner of Education and then the State Board—both having representation on the Board of Review itself—through normal channels of agency review. See *N.J.S.A.* 18A:4–34 (authorizing assistant commissioners of education to hear and determine "controversies and disputes which may arise under the school laws...."). The appropriate practice under the rules is to require direct Appellate Division review of all Board of Review judgments, as was done in *Union County I, supra,* 298 *N.J.Super.* at 5, 688 *A.*2d 1082.

the remaining regional district." *N.J.A.C.* 6:3–7.4. Under that framework, the Board of Review has broad-ranging power to assign the amounts of indebtedness to be assumed by each withdrawing municipality, but the Board may order asset distribution only if, pursuant to *N.J.A.C.* 6:3–7.4, the Board finds that a specific formula for asset distribution is necessary to ensure a "thorough and efficient education" in each of the withdrawing municipalities. In the absence of such a finding, the authority to distribute assets is vested specifically in the county superintendent of schools pursuant to *N.J.S.A.* 18A:13–62 ("The county superintendent ... shall make a division of the assets and liabilities ... among the constituent districts in the event of a dissolution....").

Here, the Board of Review made no finding that proportional distribution of the District's liquid assets was necessary to ensure a thorough and efficient education in any of the withdrawing municipalities. The Board of Review stated only that it was not "convinced that following the statutory scheme for distribution of assets and liabilities results in an inequity of such proportion as to provide a basis for denying the petition." That finding was not sufficient to justify its intervention under *N.J.A.C.* 6:3–7.4 concerning the distribution of liquid assets, and there is no other statutory or regulatory power by which the Board of Review could have acted to specify each municipalities share of the District's liquid assets. That power rested exclusively with the Union County Superintendent of Schools, reviewable by the Commissioner of Education and the State Board. Accordingly, for purposes of our review, the Board of Review's disposition of the liquid asset distribution issue is entitled to no weight, nor, more importantly, are the determinations of the County Superintendent, Commissioner of Education, or State Board on the liquid asset issue to the extent that those determinations were based on the Board of Review order.

B

Properly framed, then, our review is of the State Board's order affirming the asset distribution order of the Union County Super-

intendent of Schools. County Superintendent Lobman's June 1997 report ordering the liquid asset distribution simply adopted the proportional formula for distributing liquid assets as set forth in *N.J.S.A.* 18A:8–24, without reference to Mountainside's objections. As noted, however, Acting County Superintendent Livingston explained earlier to the parties that, under the Appellate Division holding in *Egg Harbor, supra,* they could deviate from the *N.J.S.A.* 18A:8–24 formula only if they included their proposed formula in the referendum question.

We find *Egg Harbor* to be of limited relevance here, and we agree with the State Board that *Egg Harbor* does not oblige parties to place on the referendum ballot all proposed deviations from the statutory scheme. In *Egg Harbor,* the Township of Egg Harbor withdrew from the five-member Greater Egg Harbor Regional High School District. *Egg Harbor, supra,* 188 *N.J.Super.* at 93, 456 *A.2d* 106. The referendum question, submitted to and approved by the voters, specified that upon withdrawal, Egg Harbor would receive none of the district's assets but would assume none of its liabilities. *Id.* at 96, 456 *A.2d* 106. After the voters approved the referendum, Egg Harbor petitioned the Department of Education for a distributive share of the district's surplus budget. That petition was denied on the ground that the referendum precluded distribution to Egg Harbor of any of the district's assets. *Id.* at 97, 456 *A.2d* 106. The Appellate Division affirmed, holding that Egg Harbor was "estopped from requesting a distribution of assets because by its acquiescence, it allowed the voters to approve a plan under which it was required to relinquish a claim to any assets of the Regional District." *Id.* at 99, 456 *A.2d* 106.

*Egg Harbor,* therefore, stands only for the proposition that if a liquid asset distribution scheme is specified in a referendum question, that issue is "off the table" if the referendum is approved; parties to a withdrawal from or dissolution of a regional district cannot later seek alteration of that scheme by the Superintendent of Schools or any other executive body. *Egg Harbor* does

not hold that deviations from the statutory scheme *must* appear on the ballot, nor does it address the circumstances under which a deviation from the statutory scheme is appropriate. We find no other support for the notion that deviations from the statutory scheme must appear on the referendum ballot, and we decline to adopt that rule here.

We are thus presented with a two-fold inquiry. First, does the statutory scheme allow for deviations? And if so, did the State Board err in not ordering a deviation from the statutory scheme in this case? We answer both of those questions in the affirmative.

1

█ The State Board, Commissioner of Education, Superintendent Fitts and Acting Superintendent Livingston all either expressed or implied that deviations from the specific formula for asset distribution set forth in *N.J.S.A.* 18A:8–24 can be appropriate under certain circumstances. The legislative history and the statutory scheme for dissolution of regional districts illustrate clearly that the overriding goal of the statutory scheme is to distribute equitably the regional district's assets and liabilities. To that end, the Board of Review generally allocates debt, based on the value of real property, as a percentage of the total worth of all real property owned by the regional district. *See N.J.S.A.* 18A:13–61 ("In the event of a dissolution, the county superintendent and board of review, in determining the amount of indebtedness to be assumed by each constituent district, shall give due regard to the value of school buildings and grounds being conveyed to the constituent district in which those buildings are located."). If a withdrawing district receives a building and its withdrawal imposes an excessive burden on the regional district, then it may be required to assume debt in excess of its presumptive share. According to the legislative history, even withdrawing districts that do not receive real property may be required to assume debt.[3] Further, in keeping with the spirit of equalization,

---

[3] The statutory scheme that controls the dissolution of a regional District became law in 1993. *See N.J.S.A.* 18A:13–51–81. That legislation paralleled the

the county superintendent is required by *N.J.S.A.* 18A:13–61 to "allot a fair proportion of the shared or rotated furnishings and equipment ... to each of the constituent districts in the event of a [dissolution]."

The principal tool for equalizing the overall dissolution package is the shifting of debt. The county superintendent is first charged with calculating the overall indebtedness of the regional district. *N.J.S.A.* 18A:13–53. The Board of Review is then charged with determining the amount of indebtedness to be assumed by each community in the event of a dissolution. *N.J.S.A.* 18A:13–56. A community's potential indebtedness, as determined by the Board of Review, must be included in the notices, advertisements, and ballots for the referendum. *N.J.S.A.* 18A:13–58. Although the value of the real property and the municipality receiving that property are known, the debt burden is subject to allocation. In the event of dissolution, debt can be divided among constituent communities, and the indebtedness of communities that did not receive real property can be reduced to adjust for the value of the real property received by other communities.

That scheme presumably can result in equalization for all constituent communities, including those without real property, only when the debt load is significant (or when all communities received real property). Here, however, the District was established in 1935 and most of its debt has been paid off. The debt

---

existing law that controlled the withdrawal of constituent communities. Assembly Education Committee, *Statement to Bill No. 2294*, March 4, 1993. The Senate Education Committee statement accompanying the original legislation (which in 1975 applied only to withdrawing communities, but applies now to dissolving Districts as well) notes in part that

in the event that there are no buildings within the withdrawing District and the withdrawal would significantly reduce the 'equalized valuation per pupil,' it is the judgment of the Senate Education Committee that the intent of this provision would empower the board of review to adjust the apportionment of indebtedness by requiring the withdrawing District to assume a share of indebtedness.

[Senate Education Committee, *Statement to Bill No.* 825, October 6, 1975, 1–2.]

that remains is dwarfed by the value of the District's assets. When the debt load is small and the real property is valuable, equalization among constituent municipalities cannot be achieved simply by shifting debt.

This case illustrates the point. As noted in Table B, *supra* at 9, 773 *A*.2d at 11, adhering strictly to the proportional liquid asset distribution formula set forth in *N.J.S.A.* 18A:8–24 leaves Mountainside with $483,973, or .4% of the District's total assets, a proportion 37.5 times less than the 15% share of the District's overall budget in 1996–97 attributable to Mountainside's contribution. On the other hand, as noted in Table A, *supra* at 5, 773 *A*.2d at 8, the distribution scheme adopted in Dr. Fitts' report, and by the five municipalities in their petition for dissolution, leaves Mountainside with $2,483,160, or 2% of the District's total assets. Although still not reaching parity compared to Mountainside's budget contributions, the latter figure represents the most proportional result—measuring proportionality by asset allocation against budget contribution—that is possible in this context because of the disproportionate value of the District's real estate and the relative absence of debt.

█ Given the obvious purpose of the statutory scheme to distribute assets and liabilities equitably, and the generalized assumption in the statute that debt allocation is a sufficient mechanism for ensuring equity, we are persuaded that in these circumstances insistence on strict application of the asset distribution scheme in *N.J.S.A.* 18A:8–24 is unwarranted, particularly where, as here, the parties entering into dissolution have agreed to an alternative liquid asset distribution formula that represents a more equitable asset allocation. To hold otherwise would be to ignore the clear overriding purpose of the statutory framework in favor of ritualistic application of statutory language divorced from context. "In discharging our interpretive responsibility, we are admonished that 'each part or section [of the statute] should be construed in connection with every other part or section so as to produce a harmonious whole,' and that 'it is not proper to confine

interpretation to the one section to be construed.' " *In re Passaic County Utilities Auth. Petition Requesting Determination of Financial Difficulty and Application for Refinancing Approval,* 164 *N.J.* 270, 300, 753 *A.*2d 661 (2000) (quoting Norman J. Singer, *Sutherland Statutory Construction* § 46.05 at 103 (5th ed.1992)).

2

■ Having determined that the statutory framework permits deviation from the asset distribution formula set forth in *N.J.S.A.* 18A:8–24, we must consider whether the State Board's decision not to deviate from that formula in this case was "unreasonable . . . or violative of the legislative will." *Nelson, supra,* 148 *N.J.* at 364, 689 *A.*2d 1342.

As noted, the State Board, in affirming the proportional distribution formula, relied heavily on the Board of Review order. The State Board noted, for instance, that "there is no indication in the record before us that the Board of Review intended a departure from the statutory method for distributing the assets at issue," that the Board of Review found that proportional distribution of the liquid assets would not result in "such inequity of such proportion as to provide a basis for denying the petition," and that the ballot approved by the Board of Review did not mention liquid asset distribution. None of those justifications, as we have noted, was a proper basis for denying Mountainside's petition, because it was not the Board of Review's responsibility to direct the distribution of the District's liquid assets. The only indication of the State Board's reasoning independent of its deference to the Board of Review is the State Board's conclusion that "Mountainside has not shown any circumstances that would warrant a departure from the statutory scheme."

We find that conclusion untenable. As noted, strict application of *N.J.S.A.* 18A:8–24 would leave Mountainside and Garwood with a substantial shortfall, and the remaining municipalities with a windfall, of the District's assets based on the proportions of the

District's operating budget that each municipality contributed. Because of the composition of the District's assets, weighted heavily with real property and burdened by little debt, inequity is perhaps inevitable under any alternative. But allocating liquid assets exclusively to Mountainside and Garwood certainly helps ameliorate that disproportion, and neither the agency personnel who reviewed this issue—including three Union County superintendents, the Assistant Commissioner of Education, the Commissioner of Education, and the State Board—nor any of the parties opposing Mountainside's petition have articulated any policy justification for insisting on distributing the liquid assets to each municipality, and thereby exacerbating the overall disproportion of the municipalities' asset shares.

We are also mindful of Mountainside's argument that, when it agreed to join the dissolution petition, it did so in reliance on the expectation that it and Garwood would receive the entirety of the District's liquid assets. Although Superintendent Lobman was not bound by the recommendations in Dr. Fitts' report, we find troubling the notion that parties to a dissolution can agree to a specific method of asset distribution, and thereafter reverse course and support a distribution method that substantially disfavors one of the petitioning parties. That the five municipalities had agreed to distribute the liquid assets exclusively to Mountainside and Garwood strongly supports Mountainside's argument that the State Board erred in not deviating from the statutory framework and implementing that agreement.[4]

---

[4] Berkeley Heights argues that there was, in fact, no agreement by the municipalities to distribute liquid assets in accordance with Dr. Fitts' report. We reject that argument outright. Berkeley Heights points to language in paragraph 34 of the dissolution petition stating that "the constituent districts should be allowed to agree on an alternative plan [to Dr. Fitts' report] for the distribution of the Regional District's assets and liabilities." That language, however, must be read in the context of the petition's specific adoption, noted above, of Dr. Fitts' liquid asset distribution formula in paragraph 31 of the petition. At most, the language Berkeley Heights cites indicates that the municipalities agreed to Dr. Fitts' formula but also agreed to have the flexibility to

## III

We reverse the judgment of the Appellate Division and remand this matter to the State Board of Education, and order that Mountainside and Garwood be awarded that sum of the District's liquid assets allotted to them in Dr. Fitts' report. As noted, the liquid assets of the District already have been distributed to each of the six municipalities in accordance with Superintendent Lobman's report. We instruct the State Board, on remand, to formulate appropriate payment schedules so that Mountainside and Garwood receive their share of the District's liquid assets from the other municipalities in a timely and efficient manner.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG and ZAZZALI—5.

*Opposed*—None.

---

reach a different agreement later in the process if they so chose. But no later agreement was reached, so we are left with the municipalities' very clear and unanimous endorsement (with the exception of Garwood, which rejected the petition in its entirety but certainly would have endorsed Dr. Fitts' formula over that ordered by the Board of Review) of Dr. Fitts' formula in paragraph 31 of the dissolution petition.