839 A.2d 60 (2003)
365 N.J. Super. 255
In the Matter of ADOPTED AMENDMENTS TO N.J.A.C. 7:7A-2.4.
Superior Court of New Jersey, Appellate Division.
Argued December 10, 2003.
Decided December 23, 2003.
*62 Steven M. Dalton, Middletown, argued the cause for appellant New Jersey Builders Association (Giordano, Halleran & Ciesla, attorneys; Michael J. Gross, of counsel; Paul H. Schneider and Mr. Dalton, on the brief).
Rachel Horowitz, Trenton, argued the cause for respondent Department of Environmental Protection (Peter C. Harvey, Attorney General, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Ms. Horowitz, Deputy Attorney General, on the brief).
Carter H. Strickland, Jr., Fayetteville, argued the cause for intervenors-respondents New Jersey Audubon Society, Environmental Defense, Association of New Jersey Environmental Commissions, New Jersey Conservation Foundation, the Pinelands Preservation Alliance and American Littoral Society (Rutgers Environmental Law Clinic, attorneys; Thomas A. Borden, on the brief).
Before Judges CONLEY, CARCHMAN and WECKER.
*61 The opinion of the court is delivered by CONLEY, P.J.A.D.
In this Freshwater Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30, appeal, the New Jersey Builders Association (Builders) challenges as ultra vires the Department of Environmental Protection's (DEP) 2002 amendment to N.J.A.C. 7:7A-2.4 which adopts the Landscape Project method to classify those wetlands which support the habitats of threatened or endangered species. That method replaces "the past, species, sighting-specific `areas of documentation' with the species population/habitat complex Landscape Maps." Under this method, wetlands which contain habitat characteristics that endangered or threatened species use and require for breeding, resting and feeding are classified as wetlands of exceptional resource value. Builders argues that the governing statute limits identification of wetlands of exceptional value to habitats of present sighted endangered or threatened species or a documented presence of an endangered or threatened species. Therefore, it claims, a method such as the Landscape Project method which broadens the focus of the habitat classification process to encompass not only actual sightings but habitat characteristics needed and required for an endangered or threatened species' population, exceeds the statutory mandate. We do not view the enabling statute to be so restrictive and affirm DEP's amendment to N.J.A.C. 7:7A-2.4.

I.
Prior to enactment of the FWPA, freshwater wetlands in New Jersey were regulated through a permit program administered by the United States Environmental Protection Agency conducted by the United *63 States Army Corps of Engineers pursuant to section 404 of the "Federal Water Pollution Control Act Amendments of 1972" as amended by the "Clean Water Act of 1977." 33 U.S.C.A. § 1344. The Federal Act authorizes states to assume administration of the federal wetlands permit program, provided that the state has its own program that is at least as stringent as the federal program. 33 U.S.C.A. § 1344(g),(h); 40 C.F.R. § 232 to 233 (2002); In the Matter of Freshwater Wetlands Prot. Act Rules, 238 N.J.Super. 516, 520, 570 A.2d 435 (App.Div.1989).
As a result, in 1987 the Legislature enacted the FWPA, which "provides a comprehensive scheme for the regulation and protection of New Jersey's freshwater wetlands." MCG Assocs. v. Dep't of Envtl. Prot., 278 N.J.Super. 108, 111, 650 A.2d 797 (App.Div.1994). "The Legislature recognized the importance of wetlands for purifying water, preventing floods, retarding soil erosion and providing a habitat for wildlife, but also recognized the need to protect the rights of property owners in balance with environmental interests." Ibid. To achieve these goals, the Legislature found it was "important that the State expeditiously assume the freshwater wetlands permit jurisdiction currently exercised by the [Corps] pursuant to the Federal Act and implementing regulations." N.J.S.A. 13:9B-2 (footnote omitted). DEP was designated as the agency responsible for implementing the Act and was directed by the Legislature to adopt rules and regulations in that regard. N.J.S.A. 13:9B-25. While enactment of the FWPA has been recognized as reflecting "a `delicate compromise' between environmentalists and developers," In the Matter of Appeal of Adoption of N.J.A.C. 7:7A 1.4, 240 N.J.Super. 224, 237, 573 A.2d 162 (App.Div.1989) (Skillman, J., dissenting), rev'd on dissent, 118 N.J. 552, 573 A.2d 143 (1990) (internal citation omitted), where proactive environmental measures are within DEP's enabling authority, they will be upheld. See In the Matter of the Protest of Coastal Permit Program Rules, 354 N.J.Super. 293, 346-51, 807 A.2d 198 (App.Div.2002); In re Adoption of N.J.A.C. 7:1E, 255 N.J.Super. 469, 605 A.2d 733 (App.Div.1992); Society for Envtl. Econ. Div. v. New Jersey Dep't of Envtl. Prot., 208 N.J.Super. 1, 504 A.2d 1180 (App.Div.1985).

II.
The FWPA requires that "[DEP] shall develop a system for the classification of freshwater wetlands based upon criteria which distinguish among wetlands of exceptional resource value, intermediate resource value, and ordinary resource value." N.J.S.A. 13:9B-7. It is the category of "exceptional resource value" freshwater wetlands that is at issue here. As defined by the FWPA such wetlands are:
Those which are present habitats for threatened or endangered species, or those which are documented habitats for threatened or endangered species which remain suitable for breeding, resting, or feeding by these species during the normal period these species would use the habitat. A habitat shall be considered a documented habitat if [DEP] makes a finding that the habitat remains suitable for use by the specific documented threatened and endangered species, based upon information available to it, including but not limited to, information submitted by an applicant for a freshwater wetlands permit.
[N.J.S.A. 13:9B-7(a)(2).][1]
*64 Delineation of wetlands of "exceptional resource value," then, is dependent upon DEP's determination that the wetlands area is either a present habitat for a threatened or endangered species or a documented habitat for such species. The FWPA does not define habitat. The concept of habitat is rather broad. As normally defined habitat is "the environment in which an organism or biological population usu[ally] lives or grows." Webster's II New College Dictionary, 497-98 (1999). A documented habitat is one for which DEP "makes a finding that the habitat remains suitable for use by the specific documented threatened and endangered species, based upon information available to it...." N.J.S.A. 13:9B-7(a)(2). See also N.J.A.C. 7:7A-2.4(b)(2),(3); N.J.A.C. 7:7A-1.4. N.J.A.C. 7:7A-2.4(c) currently provides in relevant part:
[DEP] identifies present or documented habitat for threatened or endangered species for purposes of [N.J.A.C. 7:7A 2.4(b)] using the Landscape Project method, which focuses on habitat areas required to support local populations of threatened or endangered wildlife species. The details of this method are described in the Land Use Regulation Program's freshwater wetlands technical manual ...
[N.J.A.C. 7:7A-2.4(c).][2]
Before it amended N.J.A.C. 7:7A-2.4 in 2002 to adopt the Landscape Project method in the classification of freshwater wetlands, DEP made its wetlands habitat determinations entirely on specific sightings of individual threatened or endangered species. It was then assumed that each individual species sighted was located in the middle of its home range. As a result of that assumption, DEP mapped as habitat for that species a polygonal-shaped area surrounding the location of the sighted species. This methodology mapped polygons around each sighted species as habitat, regardless of whether the entire mapped area contained the vegetation, topography, water resources, or other landscape features that the species actually would use or require. For example, by using this methodology, if a threatened or endangered species were sighted at a particular location, the resulting habitat map would include that location and its environs, regardless of whether the environs were forested, developed, paved or in agricultural use, and regardless of whether these land covers and uses would provide suitable or unsuitable habitat for the sighted species. Thus, the prior mapping was not based on the particular habitat needs of the sighted species, but only on the species' given location at a particular point in time. In addition, the former mapping method focused only on each individual species sighted or on its immediate family, rather than on the habitat needs of the species in its entirety. This mapping method protected random, fragmented habitat patches, rather than the contiguous habitat area that many threatened and endangered species require for long-term survival.
*65 In contrast, the Landscape Project method identifies as suitable habitats, sighted areas and those contiguous areas which populations of threatened and endangered species can be expected to use. Thus, the Landscape Project methodology uses species sightings in conjunction with their known habitat characteristics, focusing upon actual land cover and land use to generate habitat mapping. As explained by DEP in its 2002 manual:
In the first edition of the FWPA Protocols (DEP 1995), the Department largely focused on protecting only those habitats known to be occupied and suitable for use by an individual or local population of a particular species. Suitable habitat outside of the estimated area of use by these animals was not considered to be a "documented habitat" and therefore not considered to be endangered or threatened species habitat whether or not that habitat was contiguous with the "documented" habitat. At that time, the Department felt that this strategy was the best applied approach to (1) ensure appropriate natural resource protection, and (2) provide for consistency and predictability in the regulatory process.
However, changes to New Jersey's landscape over the last 10-15 years and the evolution of landscape based habitat protection theories have led the Department to re-evaluate this protection strategy. The rapid suburbanization of our landscape has led to the loss and degradation of critically important wildlife habitats, and the fragmentation and isolation of the habitats that remain. Many rare species populations require large contiguous blocks of habit to survive. Small patches of fields, forests and wetlands interspersed with development provide habitat for some common species, but do not provide the necessary habitat for the long-term protection of most of our endangered or threatened animal species. Examples of these conditions include the loss of 40 percent of the remaining critical migratory bird stopover habitat on the lower third of the Cape May Peninsula and approximately 50 percent of the state's bog turtle habitat during the last three decades. In addition, recent studies conducted to assess the status of the state-listed raptors in south Jersey have raised questions about the long-term stability of their populations (Sutton and Dowdell 2001). As a result, the Department conducted a re-assessment of its regulatory efforts under the FWPA to see if the above objectives were being met and determined that a change in approach was necessary.
To this end, the Department sought to establish a more population driven parameter of habitat protection which would best ensure the continued, long-term existence of a particular documented species or population in an identified wetland habitat. As a solution, the Department has decided to replace the past, species, sighting-specific "areas of documentation" with the species population/habitat complex Landscape Maps to improve upon both the predictability and quality of the habitat protection provided under the FWPA.
The Landscape Project method, then, provides more flexibility in the classification process by broadening the field of inquiry beyond "sighting-specific" areas to contiguous wetlands containing the sighted species' habitat characteristics.

III.
Agency regulations are presumed valid and are accorded a presumption of reasonableness. New Jersey State League of Municipalities v. Dep't of Cmty. Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999); GE Solid State, Inc. v. Dir., *66 Div. of Taxation, 132 N.J. 298, 306, 625 A.2d 468 (1993); A.A. Mastrangelo, Inc. v. Comm'r of the Dep't of Envtl. Prot., 90 N.J. 666, 683, 449 A.2d 516 (1982). Findings of ultra vires actions are disfavored. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561, 384 A.2d 795 (1978).
"The `fundamental consideration' in reviewing agency actions `is that a court may not substitute its judgment for the expertise of an agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable.'" In the Matter of Distribution of Liquid Assets Upon Dissolution of Union County Reg'l High School Dist. No. 1, 168 N.J. 1, 10, 773 A.2d 6 (2001) (quoting Williams v. Dep't of Human Servs., 116 N.J. 102, 107, 561 A.2d 244 (1989)). Substantial deference is accorded by reviewing courts to the interpretation an agency gives of a statute that the agency is charged with enforcing. GE Solid State, Inc., supra, 132 N.J. at 306, 625 A.2d 468; In the Matter of Freshwater Wetlands Prot. Act Rules, 351 N.J.Super. 362, 378, 798 A.2d 634 (App.Div.), certif. granted, 175 N.J. 171, 814 A.2d 636 (2002); Housley v. Wave Energy Sys., Inc., 343 N.J.Super. 574, 582, 779 A.2d 453 (App. Div.2001).
That deference "stems from the recognition that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are `particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that ... rulemaking would invite.'" New Jersey State League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21 (quoting Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs., 96 N.J. 456, 474, 476 A.2d 784 (1984)). Deference to an administrative agency is especially appropriate when new and innovative legislation is being put into practice, or when the agency has been delegated discretion to determine the specialized and technical procedures for its tasks. In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 450-51, 608 A.2d 288 (1992); Newark Firemen's Mut. Benevolent Ass'n, Local No. 4 v. City of Newark, 90 N.J. 44, 55, 447 A.2d 130 (1982).
[T]he judicial role [in reviewing regulations] is restricted to three inquiries: (1) whether the agency's action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
[In the Matter of Petition for Rulemaking, N.J.A.C. 10:82-1.2 and 10:85-4.1, 117 N.J. 311, 325, 566 A.2d 1154 (1989) (citing Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963)) ].
Thus a regulation can only be set aside if it is proved to be arbitrary or capricious, plainly transgresses the statute it purports to effectuate, or alters the terms of the statute and frustrates the policy embodied in it. New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n, 82 N.J. 57, 82, 411 A.2d 168 (1980). The burden is on the party challenging the validity of the regulation. New Jersey State League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21. Moreover, a regulation is "subject to the same rules of construction as a statute and should be construed according to the plain meaning of the language." In re 1999-2000 Abbott v. Burke Implementing *67 Regulations, 348 N.J.Super. 382, 399, 792 A.2d 412 (App.Div.2002).
Of course an administrative agency cannot, under the guise of administrative interpretation, give a statute any greater effect than is permitted by the statutory language. In re Adoption of N.J.A.C. 7:26B, supra, 128 N.J. at 450, 608 A.2d 288. "It is, however, a basic principle that the agency's power exists solely as granted by the Legislature." DiVigenze v. Chrysler Corp., 345 N.J.Super. 314, 327, 785 A.2d 37 (App.Div.2001), certif. denied, 171 N.J. 442, 794 A.2d 181 (2002). Reviewing courts "will intercede if the agency's action exceeds the bounds of its discretion." In the Matter of Distribution of Liquid Assets, supra, 168 N.J. at 11, 773 A.2d 6. Courts have therefore invalidated regulations that flout the statutory language and undermine the intent of the Legislature. In re Adoption of N.J.A.C. 7:26B, supra, 128 N.J. at 450, 608 A.2d 288. See MCG Assocs. v. Dep't of Envtl. Prot., supra, 278 N.J.Super. at 111, 650 A.2d 797; In the Matter of Freshwater Wetlands Prot. Act Rules, supra, 238 N.J.Super. at 530, 570 A.2d 435.

IV.
We do not find a flouting of the enabling statute or undermining of the legislative intent reflected by the adoption of the Landscape Project Method to delineate wetlands of exceptional value. The statute does not restrict classification of such wetlands to habitats in which an endangered or threatened species either has presently been sighted or has been sighted in the past. Its focus is upon the habitats of such species and affords DEP broad discretion to document such habitats. "[A] documented habitat" exists if DEP "makes a finding that the habitat remains suitable for use by the" threatened or endangered species. N.J.S.A. 13:9B-7(a)(2). The Landscape Project method broadens the inquiry to include habitats in which there have been actual sightings or other physical evidence of an endangered or threatened species, and contiguous wetlands which contain the natural characteristics that make it suitable for that species to populate. The evident premise is that endangered or threatened species are not stationary. As DEP has found, "[m]any rare species populations require large contiguous blocks of habitat to survive." It is difficult to quarrel with DEP's observation that "[t]he rapid suburbanization of our landscape has led to the loss and degradation of critically important wildlife habitats, and the fragmentation and isolation of the habitats that remain." Moreover, Builders does not dispute DEP's examples of a 40 percent loss of "the remaining critical migratory bird stopover habitat on the lower third of the Cape May peninsula" and "approximately 50 percent of the State's bog turtle habitat." DEP's effort to adopt a more protective approach through the Landscape Project method is neither inconsistent with the governing statute, unsupported by the record, nor arbitrary or capricious.
Affirmed.
NOTES
[1] Under N.J.S.A. 13:9B-7(a)(1), freshwater wetlands of exceptional resource value are also "[t]hose which discharge into FW-1 waters and FW-2 trout production (TP) waters and their tributaries." These type of exceptional resource wetlands are not the subject of this appeal.
[2] The Landscape Project method uses satellite imagery to determine habitat type. The species data is then overlaid onto habitat maps. Species data are taken in large part from the National Heritage Program's Biological Conservation Database. That database includes DEP on-site research, environmental consultant reports, and information from members of the public. Before being entered into the database, all records are verified and mapped by a staff biologist. Only those sightings mapped to within one second of latitude and longitude that occurred after 1970 are used to identify critical areas.