871 A.2d 711 (2005)
377 N.J. Super. 78
In re ADOPTION OF N.J.A.C. 7:26E-1.13.
Superior Court of New Jersey, Appellate Division.
Argued January 25, 2005.
Decided April 22, 2005.
*712 Dennis J. Krumholz, Morristown, argued the cause for appellant Federal Pacific *713 Electric Company (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Mr. Krumholz and Marilynn R. Greenberg, of counsel; Steven T. Senior and Bryan J. Ng, on the brief).
Edward F. McTiernan, Newark, argued the cause for appellant New Jersey State Chamber of Commerce (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Mr. McTiernan, of counsel; Paul M. Hauge, on the brief).
Jane F. Engel, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Mariellen Dugan, Acting Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Ms. Engel, on the brief).
Reed Smith, attorneys for amici curiae Chemistry Council of New Jersey and New Jersey Petroleum Council, a division of the American Petroleum Institute (Steven J. Picco, of counsel; Thomas J. Burns III, and Christina Stummer, on the brief).
Lowenstein Sandler, attorneys for amicus curiae Technical Regulations Advisory Coalition (Stephen W. Smithson and John A. Orlowski, on the brief).
Rutgers Environmental Law Clinic, attorneys for amici curiae Edison Wetlands Association, New York/New Jersey Baykeeper, New Jersey Environmental Federation, New Jersey Work Environment Council, New Jersey Environmental Justice Alliance, and Ironbound Community Corporation (Susan J. Kraham, of counsel and on the brief).
Before Judges COBURN, S.L. REISNER and GRAVES.
The opinion of the court was delivered by
COBURN, J.A.D.
At issue is the validity of a regulation, N.J.A.C. 7:26E-1.13, adopted by the Department of Environmental Protection ("DEP" or "Department") on February 3, 2003. The regulation was intended to implement key provisions of the Brownfield and Contaminated Site Remediation Act, N.J.S.A. 58:10B-1 to -31 ("Brownfield Act"). To that end, it sets minimum ground water[1] and surface water remediation standards for the cleanup of contaminated property under all New Jersey environmental remediation laws, including the Industrial Site Recovery Act, N.J.S.A. 13:1K-6 to -14 ("ISRA").
In the Brownfield Act, the Legislature defined "brownfields" as "urban and suburban areas formerly used for commercial and industrial purposes[,]" which "are underused or abandoned[,]" and often "contaminated with hazardous substances" that "pose a health risk to the nearby residents and a threat to the environment[.]" N.J.S.A. 58:10B-1.2. The Legislature found that brownfields "can be a blight ... and a financial drain...." Ibid. After noting that there often were "legal, financial, technical, and institutional impediments to the efficient and cost-effective cleanup of brownfield sites [,]" the Legislature declared
that the State needs to ensure that the public health and safety and the environment are protected from the risks posed by contaminated sites and that strict standards coupled with a risk based and flexible regulatory system will result in more cleanups and thus the elimination *714 of the public's exposure to these hazardous substances and the environmental degradation that contamination causes.
[Ibid. (emphasis added).]
Broadly speaking, this case turns on what the Legislature meant by the above quoted phrase "strict standards coupled with a risk based and flexible regulatory system."
Appellants, Federal Pacific Electric Company and the New Jersey State Chamber of Commerce, argue that the regulation violates the Brownfield Act by its insistence on a level of remediation intended to make ground water under contaminated brownfield sites eventually safe to drink. More specifically, they claim that the DEP violated the Brownfield Act by applying pre-existing ground water standards for potable water to remediation of industrial sites under ISRA, instead of promulgating new, less stringent, site specific standards. Their position is endorsed in amici curiae briefs submitted by the Chemistry Council of New Jersey, the New Jersey Petroleum Council, and the Technical Regulations Advisory Coalition. It is opposed by the DEP and in amici curiae briefs submitted by Edison Wetlands Association, New York/New Jersey Baykeeper, New Jersey Environmental Federation, New Jersey Work Environment Council, New Jersey Environmental Justice Alliance, and the Ironbound Community Corporation.
As both sides recognize, the validity of the regulation cannot be determined by simply comparing its language to the critical terms of the Brownfield Act. That is so in part because the regulation incorporates prior regulations by reference. It is also so because the Brownfield Act's instructions to the DEP require it to develop remediation standards by reference, in part, to unspecified data, such as "scientific evidence," and "reasonable assumptions of exposure scenarios," while "avoid[ing] the use of redundant conservative assumptions." N.J.S.A. 58:10B-12(b). In short, neither the regulation nor the statute can be understood without considering the administrative process surrounding the proposal of the regulation and without placing both in the context of "New Jersey's ongoing [legislative and administrative] efforts to clean up hazardous waste emanating from industrial sites." In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 445, 608 A.2d 288 (1992). Our review of the Brownfield Act and the regulation in that context leads us to conclude that the regulation is valid.

I

THE BROWNFIELD ACT AND THE REGULATION
The Brownfield Act, which was enacted in 1997, L. 1997, c. 278, directed the Department to
adopt minimum remediation standards for soil, groundwater, and surface water quality necessary for the remediation of contamination of real property. The remediation standards shall be developed to ensure that the potential for harm to public health and safety and to the environment is minimized to acceptable levels, taking into consideration the location, the surroundings, the intended use of the property, the potential exposure to the discharge, and the surrounding ambient conditions, whether naturally occurring or man-made.

[N.J.S.A. 58:10B-12(a)(emphasis added).]
Appellants' case is primarily based on that subsection and on the following subsection, which directs the DEP, in its development of minimum remediation standards to:

*715 1) base the standards on generally accepted and peer reviewed scientific evidence or methodologies;
2) base the standards upon reasonable assumptions of exposure scenarios as to amounts of contaminants to which humans or other receptors will be exposed, when and where those exposures will occur, and the amount of that exposure;
3) avoid the use of redundant conservative assumptions. The department shall avoid the use of redundant conservative assumptions by the use of parameters that provide an adequate margin of safety and which avoid the use of unrealistic conservative exposure parameters and which guidelines make use of the guidance and regulations for exposure assessment developed by the United States Environmental Protection Agency pursuant to the ... [CERCLA][2] and other statutory authorities as applicable;
4) where feasible, establish the remediation standards as numeric or narrative standards setting forth acceptable levels or concentrations for particular contaminants; and
5) consider and utilize, in the absence of other standards used or developed by the Department of Environmental Protection and the United States Environmental Protection Agency, the toxicity factors, slope factors for carcinogens and reference doses for non-carcinogens from the United States Environmental Protection Agency's Integrated Risk Information System (IRIS).
[N.J.S.A. 58:10B-12(b).]
In the next subsection, the Brownfield Act states that the "department may develop differential remediation standards for surface water or groundwater that take into account the current, planned, or potential use of that water in accordance with the ... [New Jersey]'Water Pollution Control Act'...." N.J.S.A. 58:10B-12(c)(2)(internal citations and footnote omitted).
In developing those standards the Legislature also instructed the DEP to "identify the hazards posed by a contaminant to determine whether exposure to that contaminant can cause an increase in the incidence of an adverse health effect and whether the adverse health effect may occur in humans." N.J.S.A. 58:10B-12(d). For soil remediation of human carcinogens, it set the minimum standard as one that would cause no more than "an additional cancer risk of one in one million[,]" N.J.S.A. 58:10B-12(d)(1), which was the same standard previously set for drinking water in the Safe Drinking Water Act, N.J.S.A. 58:12A-13(b). Until adoption of the standards, the DEP was to apply remediation standards "on a case-by-case basis...." N.J.S.A. 58:10B-12(a).
The regulation at issue establishes numeric and narrative ground water remediation standards. It describes the numeric standards in this manner:
i. The Ground Water Quality Standards, N.J.A.C. 7:9-6, Appendix, Tables 1 and 2;
ii. The standards resulting from application of the procedures in N.J.A.C. 7:9-6.7(c)2 through 6, for the derivation of a new criterion where a specific contaminant is not listed in N.J.A.C. 7:9-6, Appendix, Table 1; and
iii. The standards resulting from application of the procedures in N.J.A.C. 7:9-6.7(c)3 for the derivation of a new criterion when the Department determines *716 that current scientific information indicates that a specifically listed numeric criterion is no longer appropriate. The Department will post criteria developed pursuant to (b)(1)ii and iii above on the Department's website....
[N.J.A.C. 7:26E-1.13(b)(1).]
The same rule adopts the following narrative ground water remediation standards to determine how and when the numeric standards will be achieved:
i. The general groundwater quality policies in N.J.A.C. 7:9-6.2;
ii. The narrative groundwater quality criteria in N.J.A.C. 7:9-6.7;
iii. The groundwater quality antidegradation policy in N.J.A.C. 7:9-6.8;
iv. The remediation requirements in N.J.A.C. 7:26E-1 through 8 in order to both:
(1) Address the adverse impact of the contamination on the groundwater itself; and
(2) Limit additional risks posed by the contamination to the public health and safety and to the environment;
v. Removal, treatment, or containment of free and residual product pursuant to N.J.A.C. 7:26E-6.1(d);
vi. Ensure no release of contaminants to the ground surface, structures or air in concentrations that pose a threat to human health; and
vii. The following factors, as applicable on a site-specific basis, for selecting an appropriate groundwater remedial action:
(1) The location of the contaminated site relative to groundwater use;
(2) The potential human and environmental exposure to the groundwater contamination;
(3) The present, projected, and potential groundwater use at the site and in the area surrounding the site over the 25 years after the selection of the groundwater remedy;
(4) Ambient groundwater quality at the site and in the area surrounding the site resulting from both natural and human activities;
(5) The physical and chemical characteristics of the contaminants of concern; and
(6) The criteria in N.J.A.C. 7:26E-6.3(d)1i, to determine when natural remediation is appropriate as a remedial action for groundwater contamination.
[N.J.A.C. 7:26E-1.13(b)(2).]
Under this rule, the Department will "not accept alternate numeric groundwater remediation standards ... based on a site-specific risk assessment." N.J.A.C. 7:26E-1.13(d). Thus, site-specific standards affect the type, such as natural remediation versus a conventional pump-and-treat approach, and the timing of the remedial action, but do not alter the numeric groundwater remediation standards. N.J.A.C. 7:26E-1.13(d).

II

THE LEGISLATIVE AND ADMINISTRATIVE CONTEXT UP TO ADOPTION OF THE BROWNFIELD ACT
In 1976, the Legislature enacted the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24. It imposed strict liability on polluters, N.J.S.A. 58:10-23.11g(c)(1), and gave the DEP broad powers to force the cleanup of hazardous substances that threatened the economy and environment. N.J.S.A. 58:10-23.11a; N.J.S.A. 58:10-23.11i.
In 1977, the Legislature enacted the Water Quality Planning Act, N.J.S.A. 58:11A-1 to -16 ("WQPA"), and the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -60 ("WPCA"). In the WQPA, the *717 Legislature noted that "the people of the State have a paramount interest in the restoration, maintenance and preservation of the quality of the waters of the State for the protection and preservation of public health and welfare...." N.J.S.A. 58:11A-2(a)(emphasis added). It also declared that the objective of the act was to "restore and maintain the chemical, physical and biological integrity of the waters of the State, including groundwaters...." N.J.S.A. 58:11A-2(b)(emphasis added). In the WPCA the Legislature again emphasized the need to restore water quality, N.J.S.A. 58:10A-2, and authorized the Department to adopt "reasonable codes, rules and regulations to prevent, control or abate water pollution[,]" N.J.S.A. 58:10A-4, including "[t]he classification of the surface and ground waters of the State and the determination of water quality standards for each such classification." N.J.S.A. 58:10A-4(c).
The DEP responded to the WQPA and the WPCA in 1977 by adopting Ground Water Quality Standards ("GWQS"), initially for the protection of the ground water resources of the Pine Barrens. N.J.A.C. 7:9-6.1 to -6.11. The goal of the GWQS was protection of the "ambient ground water quality, through the establishment of constituent standards for ground water pollutants." N.J.A.C. 7:9-6.1.
In 1981, the DEP applied the GWQS to the entire state. N.J.A.C. 7:9-6.1. Water was classified on a regional basis according to current, planned, or potential use. N.J.A.C. 7:9-6.5(c); N.J.A.C. 7:9B-1.2. Three classifications of ground water areas were established: Class I, ground water areas of special ecological significance; Class II, ground water areas having existing or potential potable supplies; and Class III, ground water areas unsuitable for potable water due to natural characteristics, such as salt-water intrusion. Class II was further divided into Class II-A, areas that have water which is potable or potable with conventional treatment; and Class II-B, areas that have minimal or no withdrawals for potable water supply and have an extensive history of ground water pollution. N.J.A.C. 7:9-6.5(c), (e), and (f).
Because New Jersey relies so heavily on ground water resources and because potable wells exist throughout the state, most ground water areas have been classified as II-A. 35 N.J.R. 737 (Feb. 3, 2003). No ground water area has been classified as II-B, although there is a process for parties to petition for that classification. Id. at 730-31. The GWQS also establish a process for creating Classification Exception Areas ("CEA"). A CEA suspends the use of the ground water for its classified use while it is being remediated. N.J.A.C. 7:9-6.6(d).
In 1983, the Legislature adopted the Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K-6 to -14 ("ECRA"), to achieve expeditious cleanup of contaminated industrial sites when they were sold or closed. ECRA required the Department to adopt standards designed to insure appropriate resulting soil and ground and surface water quality. By way of guidance, ECRA said that the Department should adopt rules establishing
minimum standards for soil, groundwater and surface water quality necessary for the detoxification of the site of an industrial establishment, including buildings and equipment, to ensure that the potential for harm to public health and safety is minimized to the maximum extent practicable, taking into consideration the location of the site and surrounding ambient conditions; criteria necessary for the evaluation and approval of cleanup plans; a fee schedule, as necessary, reflecting the actual costs associated *718 with the review of negative declarations and cleanup plans; and any other provisions or procedures necessary to implement this act. Until the minimum standards described herein are adopted, the department shall review, approve or disapprove negative declarations and cleanup plans on a case by case basis....
[L. 1983, c. 330, § 5 (emphasis added).]
In May 1992, the Department proposed technical rules establishing requirements for investigation and remediation of environmentally contaminated sites. 25 N.J.R. 2281(b) (June 7, 1993). The technical rules established a phased approach to remediation requiring the identification of a contaminant, the delineation of the extent of the contamination, and the procedures for remediation. N.J.A.C. 7:26E-3 to -6. The proposed rules defined "applicable remediation standard" to mean
the numeric standard to which contaminants must be remediated for soil, ground water or surface water, or other environmental media, to allow for a specified site use, as provided by the Department pursuant to rule, including without limitation the ... [GWQS], N.J.A.C. 7:9-6, and Surface Water Quality Standards, N.J.A.C. 7:9-4, or as determined by the Department on a case by case basis.
[25 N.J.R., supra, at 2441.]
The proposed technical rules did not, however, provide numeric standards and the Department noted that it intended to propose those standards "in the near future." Id. at 2289. Effective February 1, 1993, the Department readopted the GWQS with amendments, providing
the basis for protection of ambient ground water quality, through the establishment of constituent standards for ground water pollutants. These constituent standards are applicable to the development of ... ground water cleanup standards and compliance levels beyond the boundaries of a contaminated site pursuant to applicable regulatory programs; and other requirements and regulatory actions applicable to discharges that cause or may cause pollutants to enter the ground waters of the State, including nonpoint and diffuse sources regulated by the Department. Other relevant laws through which the ... [GWQS] may be applied include, but are not limited to, the Spill ... Act ..., the Solid Waste Management Act ..., [and]... [ECRA]....
[N.J.A.C. 7:9-6.1(b)(internal citations omitted).]
In June 1993, the Legislature amended ECRA and renamed it ISRA in response to criticism that the complicated program had stagnated the transfer of contaminated property and had created other problems. L. 1993, c. 139. The DEP and appellants refer to this law as "S. 1070," and we shall do likewise on occasion. The Legislature found in part that
discharges of toxic chemicals dating back to early industrialization have left a legacy of contaminated industrial property in this State; that in 1983, due to the growing public awareness and concern of the risks to the public health and the environment and the potential costs to the State to clean up abandoned contaminated sites, ... [ECRA] was enacted. The Legislature also finds that the act's imposition of a cleanup plan approval before the transfer or upon the closing of an industrial establishment and the requirement to establish a funding source for the cleanup are in the general public interest.... The Legislature further finds that at the time of the act's passage, the extent of the State's industrial contamination and the cost and complexity of remediations were not *719 well understood; that in the intervening years, there has been a significant advance in the body of knowledge concerning how to remediate contaminated sites effectively and how to manage the remediation efficiently; that the regulated and financial communities are now more familiar with the liabilities involving contaminated property and with the necessity to discover and remediate that contamination; and that it is in the interest of the environment and the State's economic health to promote certainty in the regulatory process by incorporating that knowledge to create a more efficient regulatory structure... where it is possible to do so without incurring unnecessary risks to the public health or the environment.
The Legislature therefore declares that it is the policy of this State to protect the public health, safety, and the environment, to promote efficient and timely cleanups, and to eliminate any unnecessary financial burden of remediating contaminated sites; that these policies can be achieved by streamlining the regulatory process, by establishing summary administrative procedures for industrial establishments that have previously undergone an environmental review, and by reducing oversight of those industrial establishments where less extensive regulatory review will ensure the same degree of protection to public health, safety, and the environment; and that the new procedures established pursuant to this act shall be designed to guard against redundancy from the regulatory process and to minimize governmental involvement in certain business transactions.
[N.J.S.A. 13:1K-7.]
Under ISRA, the DEP was again directed to adopt rules and regulations establishing "criteria and minimum standards necessary for the submission, evaluation and approval of plans or results of preliminary assessments, site investigations, remedial investigations, and remedial action workplans and for the implementation thereof." N.J.S.A. 13:1K-10(a)(1).
S. 1070 also enacted the Hazardous Discharge Site Remediation Act, N.J.S.A. 58:10B-1 to -31, which was later amended and renamed by L. 1997, c. 278, as the "Brownfield and Contaminated Site Remediation Act," the statute primarily at issue. As do the parties, we shall refer on occasion to this law, the Brownfield Act, as S. 39.
The Brownfield Act, S. 39, includes a legislative declaration that "strict remediation standards are necessary to protect public health and safety and the environment; that these standards should be adopted based on the risk posed by discharged hazardous substances...." N.J.S.A. 58:10B-1.2
And the Senate Environment Committee stated that the bill "will not lessen any environmental or health standards. The strict standards set in the 1993 legislation and enforced by the [DEP] will remain in place." Senate Environment Committee, Statement to S.39 (June 5, 1997).

III

DEP'S RESPONSE TO THE BROWNFIELD ACT AND ITS DEVELOPMENT AND ADMINISTRATIVE DEFENSE OF THE REGULATION
In 1995 the DEP readopted the GWQS. 27 N.J.R. 3519(a) (Sept. 18, 1995). In its regulatory summary, it did not mention S. 1070, stating instead that the regulations served "the purpose for which they were originally promulgated." 27 N.J.R., supra, at 3519(a).
In 1996, the DEP published the proposed readoption of the technical rules, *720 now listing S. 1070 and S. 39 as authority. 28 N.J.R. 1098(a) (Feb. 20, 1996). It received 1131 comments and held a public hearing. 29 N.J.R. 2278(b) (May 19, 1997). The readoption was finalized on May 19, 1997. Ibid. The substantive changes that were adopted at that time primarily related to remediation standards for soil, not ground water, and there is no indication in the summary that the proposed rule would establish the minimum remediation standards for ground water. 28 N.J.R., supra, at 1098-99. Nevertheless, at least two of the commentators understood that the GWQS were to be used as remediation standards under S. 1070. 29 N.J.R., supra, at 2286, 2302.
On July 2, 1999, the Department adopted amendments to the technical rules, again listing S. 1070 and S. 39 as authority. Ground water was added to the definition of environmentally sensitive areas. N.J.A.C. 7:26E-1.8; 31 N.J.R. 2167(a), 2179-80 (Aug. 2, 1999). The Department explained that
[n]ot only is ground water important as a potable drinking water source, particularly in times of drought emergencies, but also in its role as an integral part of the ecosystems of this State. For example, some of the important ecological services that ground water provides includ[es] the cycling and movements of nutrients, surface water recharge, prevention of saltwater intrusion, ground stabilization and the prevention of sinkholes, maintenance of critical water levels in freshwater wetlands, as well as other ecosystem management functions. In addition, there are human uses of ground water other than drinking water, including irrigation for agriculture, heated water for geothermal plants, cooling water for other power plants, and other industrial uses. Furthermore, "[g]iven the dense population and industrialization of the State, reduced ground water recharge and potential [for] contamination of this resource are of great concern and increase the need for its protection.["]
Thus, even [for] ground water that is not presently used as a drinking water source, discharges to that ground water can cause natural resource injuries. In order to ensure that a site is fully remediated, the Department has determined that it is necessary to evaluate whether discharges to ground water have resulted in natural resource injuries. If so, these injuries must be assessed and restored as part of the remediation of contaminated sites.
[31 N.J.R. at 2180 (internal citations omitted).]
In January 2002, the Department published the proposed regulation, which on adoption became the regulation at issue. The Department explained that since 1993 it had been using the GWQS as "numeric and narrative remediation standards for the remediation of discharges to groundwater and surface water at contaminated sites." 34 N.J.R. 171 (Jan. 7, 2002). As a result of the legislative directive contained in N.J.S.A. 58:10B-12, the Department reevaluated the GWQS and determined that it was appropriate to modify the technical rules and to clarify the use of the GWQS. 34 N.J.R., supra, at 171. Thus, the DEP proposed to
adopt numeric remediation standards that incorporate the existing groundwater quality criteria and the existing surface water quality criteria. The Department intends to apply these criteria to contaminated sites as remediation standards according to all applicable New Jersey statutes and the water classification schemes that presently exist in the ... [GWQS], and Surface Water Quality Standards. In addition, the Department *721 is proposing, at N.J.A.C. 7:26E-1.13(b)2 and (c)6, to adopt narrative remediation standards for both groundwater and surface water, that will allow for flexibility in achieving the numeric standards without increasing the risk to public health and safety posed by the discharges of hazardous substances at these contaminated sites. Finally, the Department has determined that it is appropriate to advise the regulated community that it will not accept numeric groundwater or surface water standards based upon site-specific risk assessments in lieu of the approach proposed today.
[34 N.J.R., supra, at 171.]
The DEP determined that the proposed amendments were "consistent with and further the Legislative policies" of the Brownfield Act and other related statutes, including the WPCA, WQPA, SWDA,[3] and the Spill Act. Ibid. It specifically found that the GWQS fit the requirements enumerated by the Legislature in N.J.S.A. 58:10B-12(b)(1) to (4). For example, with regard to N.J.S.A. 58:10B-12(b)(1), which requires that remediation standards be based on generally accepted and peer reviewed scientific literature, the DEP found that the GWQS were developed based upon the methodology utilized by the Drinking Water Quality Institute, including methodologies recommended by the EPA and by "risk assessment experts associated with other government agencies, scientific institutions and environmental consulting firms." 34 N.J.R., supra, at 174. But the DEP also recognized "that some of the promulgated numeric groundwater quality criteria do not take into account the latest methodologies[,]" and thus decided that the proposed rules would "allow the incorporation of scientific developments in the standards...." Ibid.
In addressing N.J.S.A. 58:10B-12(b)(2), the requirement that the standards are based upon reasonable assumptions of exposure scenarios, the DEP found that
[s]tandardized USEPA exposure scenarios were used in developing the numeric groundwater quality criteria. For example, for Class II-A aquifers, the numeric criteria are based on a "reasonable exposure scenario" for a generic drinking water standard, consistent with N.J.S.A. 58:10B-12b(2). Thus, a human adult body weight of 70 kilograms (kg) is assumed for most contaminants, and an infant weight of four kg for nitrates and nitrites. The exposure assumption used for most contaminants was the ingestion of two liters of water a day over 70 years. For nitrates and nitrites, the amount of water ingested is assumed to be 0.64 liters per day, based on infant receptors. This is a reasonable exposure scenario because a person may live in the same house or town for his or her entire life, and should be able to safely drink the water. These assumptions were initially utilized by the Drinking Water Quality Institute in 1987, and they are still the standard assumptions in use by the scientific community. They therefore satisfy the requirement to base the standards on reasonable assumptions of exposure scenarios, as well as on generally accepted and peer reviewed scientific evidence or methodologies.
[34 N.J.R., supra, at 174.]
The DEP explained, however, that
[o]ne of the most significant challenges the Department faced in developing the remediation standards was reconciling the designation of Class II groundwater as potable in areas where the groundwater is not currently in use, or is not intended to be used for drinking water *722 purposes in the near planning horizon. In an effort to maintain the potability goal of the Class II designation in those areas of the State where people are not drinking the groundwater, while at the same time following the Legislature's directions in N.J.S.A. 58:10B-12, the Department has determined that there should be some flexibility in the manner in which the numeric groundwater remediation standards are implemented. Thus, as discussed in more detail below, the implementation of the proposed remediation standards for groundwater can take into account varying exposure scenarios, based upon site-specific concerns, through the narrative standards.
[34 N.J.R., supra, at 174.]
In addressing N.J.S.A. 58:10B-12(b)(3), which requires avoiding the use of redundant conservative assumptions, the Department found that the GWQS met this requirement in that the standards were sanctioned by the EPA and that the new rule took "into account varying exposure assumptions through the narrative standards." 34 N.J.R., supra, at 174.
Similarly, with regard to N.J.S.A. 58:10B-12(b)(4), which "provides that the remediation standards shall, where feasible, be established as numeric or narrative standards[,]" the DEP indicated that it proposed "to meet this requirement, in part, by establishing numeric groundwater quality criteria contained in the [GWQS] as the Department's numeric groundwater remediation standards." 34 N.J.R., supra, at 174. The DEP would also "include a procedure to address the fact that the science on which these criteria are based is constantly developing." Ibid. Additionally, the Department proposed narrative standards, set forth in N.J.A.C. 7:26E-1.13, which would "allow for greater flexibility in the remediation of contaminated sites based upon site-specific information, such as location." 34 N.J.R., supra, at 175.
However, the Department determined "not to propose provisions to allow for alternate groundwater or surface water remediation standards based upon site-specific risk assessments." Id. at 176. The Department explained that "[a]lthough the Legislature had offered a procedure to establish an alternate numeric remediation standard for soil based upon a site-specific risk assessment ..., [it] did not extend that procedure to groundwater or surface water remediation standards." Ibid. Moreover, "the Legislature specifically recognized the distinction between water, either surface or groundwater, and soil in the Brownfield Act...." Ibid. For example, the Legislature required differential standards for soil based on residential and non-residential uses, N.J.S.A. 58:10B-12(c)(1), but treated water differently, providing that the Department "may develop differential standards for surface water or groundwater that take into account the current, planned, or potential use of the water in accordance with the `Clean Water Act' and the ... [WPCA]...." N.J.S.A. 58:10B-12(c)(2)(internal citations and footnote omitted). "The word `may' enables the Department to use its discretion to decide how to use risk information relevant to groundwater, and whether to allow an alternate remedial numeric goal for groundwater or surface water based on a site-specific risk assessment." 34 N.J.R., supra, at 176.
Thereafter, on February 11, 2002, the Department held a public hearing on the proposed rules during which Federal Pacific Electric ("FPE"), among others, testified. 35 N.J.R. 710(a) (Feb. 3, 2003).
On February 3, 2003, the Department readopted the technical rules with amendments. Ibid. The Department received *723 more than 600 public comments to its proposal, including numerous comments from appellants. For example, FPE commented that
[t]he Department should withdraw N.J.A.C. 7:26E-1.13 until appropriate standards are developed which conform with the explicit instructions of the Legislature to promulgate reasonable, scientifically-based standards that balance effective environmental protection with economic considerations.
[35 N.J.R., supra, at 712.]
The Department responded that it
began using the [GWQS] as Ground Water Remediation Standards for over a decade. [A]ll of New Jersey's success in cleaning up contaminated groundwater has been accomplished through the Department's application of the [GWQS] as the Ground Water Remediation Standards. The Department is aware that there are a number of important policy issues, including standards development, that would benefit from stakeholder input. The Department intends to propose new and updated Ground Water Quality Criteria in its upcoming proposal to readopt the [GWQS] with amendments. The Department also plans to address other sections of the [GWQS] including the antidegradation policy and the groundwater reclassification process in future rulemaking. The Department will consider the role of stakeholders in this process.
[Ibid.]
Additionally FPE commented that
[t]he two standards, the existing [GWQS] and the proposed Ground Water Remediation Standards, have different purposes. The [GWQS] are Statewide ambient standards intended to further numerous broad public policies, including the protection of ambient groundwater for drinking, while the minimum remediation standards for groundwater required by the Brownfield ... Act must be site-specific standards intended for the purpose of efficiently returning contaminated sites to productive use.
The two standards address different concerns: the [GWQS] address overall groundwater quality throughout the State, while the minimum remediation standards for groundwater address the cleanup necessary at localized contaminated sites.
The two standards also have different goals: [GWQS] are meant "to restore, enhance and maintain the chemical, physical and biological integrity of (New Jersey's) waters and to enhance the domestic, municipal, recreational, industrial and other uses of water," ... while the minimum remediation standards are meant to "ensure that the potential for harm to public health and safety and the environment is minimized to acceptable levels, taking into consideration the location, the surroundings, the intended use of the property, the potential exposure to the discharge, and the surrounding ambient conditions, whether naturally occurring or man-made," N.J.S.A. 58:10B-12(a).
Such disparate concerns and goals cannot be served by identical standards. Therefore, the [GWQS] are not appropriate for adoption as minimum Ground Water Remediation Standards.
[35 N.J.R., supra, at 727.]
The Department responded, in part, that the GWQS
by themselves, are not the minimum remediation standards for groundwater. They are the numeric standards, which together with the narrative standards at N.J.A.C. 7:26E-1.13(b) form the minimum *724 Ground Water Remediation Standards. The Department reads the Brownfield ... Act together with all the other environmental legislation that the Legislature has enacted over the past 27 years. Based upon that reading, the Department has concluded that it is appropriate to require that contaminated sites be remediated in a manner consistent with the Statewide ambient [GWQS]. It is also consistent with that legislative direction, and the Department's role in planning to meet the growing demand for drinking water in the future, to link the minimum Ground Water Remediation Standards to the [GWQS], and the classification systems and policies the Legislature articulated in the [WPCA], [WQPA], and the Water Supply Management Act [("WSMA")]. New Jersey's approach is consistent with the approach EPA takes at the Federal level to ensure that its groundwater use and classification systems complement its [CERCLA] ... remediation programs.
In comparing the purposes of the [GWQS] and the Ground Water Remediation Standards, the commenter noted that the [GWQS] establish "Statewide ambient standards intended to further numerous broad public policies." One of those "broad public policies," is that "[it] is the policy of this State to restore, enhance and maintain the chemical, physical and biological integrity of its waters...." N.J.S.A. 58:10A-1. However, ... another purpose ... is to: provide the basis for the protection of ambient groundwater quality, through the establishment of constituent standards ... applicable to the development of ... groundwater protection[;] ... groundwater cleanup standards and compliance levels beyond the boundaries of a contaminated site pursuant to applicable regulatory programs; and other requirements and regulatory actions applicable to discharges that cause ... pollutants to enter the ground waters of the State....
Thus, the [GWQS] not only establish the standards for the protection of Statewide ambient water quality, but they also provide the standards for use in other regulatory programs within the Department, such as the Site Remediation Program, to achieve the goals reflected in the "numerous broad public policies" that the commenter references.
The Ground Water Remediation Standards also have a broader purpose than "efficiently returning contaminated sites to productive use." Another purpose articulated in N.J.S.A. 58:10B-1.2 is to "ensure that the public health and safety and the environment are protected from the risks posed by contaminated sites and that strict standards coupled with a risk based and flexible regulatory system will result in more cleanups and thus the elimination of the public's exposure to these hazardous substances and the environment degradation that contamination causes." By using the [GWQS] as the numeric Ground Water Remediation Standards, the Department can ensure that a cleanup at a localized contaminated site is conducted in a manner that is not only consistent with the broad public policies articulated in numerous environmental statutes, but will also ensure that the public health and safety and the environment are protected from the risks posed by the contaminated site. The Department recognizes that there are site-specific factors that may impact the remediation of a contaminated site. To address site-specific conditions, the Department has provided for flexibility in achieving the [GWQS] through the narrative standards.

*725 By combining the strict remediation standards of the [GWQS] with flexibility through the numeric and narrative Ground Water Remediation Standards, the Department has harmonized the purposes, concerns and goals of the [GWQS] and the Minimum Ground Water Remediation Standards, as well as the ... [Brownfield Act], [WPCA], [Spill Act] and other environmental statutes.
[35 N.J.R., supra, at 727-28 (internal citation omitted)].[4]
On appeal, the Department represented that sometime in 2004 it intended to readopt the GWQS with amendments, proposing to
revise existing health-based criteria using current toxicity information from the EPA Integrated Risk Information System (IRIS). In addition, the Department intends to add criteria, and otherwise modify criteria, to reflect other development[s], in risk assessment, including new methods for calculating criteria for Group C carcinogens. Based upon information from IRIS, and other developments, the Department expects to revise, add and delete criteria for, at a minimum, 75 constituents. In addition, the Department also intends to make other amendments as appropriate, and to solicit public comment and input on the entire chapter.

IV

THE PRINCIPLES OF LAW GOVERNING REVIEW OF ADMINISTRATIVE RULEMAKING
Administrative regulations come before a court with a presumption of validity. New Jersey State League of Municipalities v. DCA, 158 N.J. 211, 222, 729 A.2d 21 (1999). Although a regulation may not alter a statute or frustrate legislative policy, the challenger has the burden of proving that the regulation does so or is otherwise arbitrary, capricious or unreasonable. Ibid. When reviewing regulations concerning complex technical matters the
judicial deference to administrative agencies stems from the recognition that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are "particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that ... rulemaking would invite."
[Ibid. (citation omitted).]
We also accord substantial deference to an agency's interpretation of a statute that it is charged to enforce, GE Solid State, Inc. v. Dir., Tax. Div., 132 N.J. 298, 306, 625 A.2d 468 (1993), provided, of course, that the regulation is "within the fair contemplation of the delegation of the enabling statute." N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561-62, 384 A.2d 795 (1978) (citation omitted). Deference is particularly appropriate when, as here, the agency must construe and implement a new statute, In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 452, 608 A.2d 288 1992), "or when the agency has been delegated discretion to determine the specialized and technical procedures for its tasks." In re Adopted Amendments to N.J.A.C. 7:7A-2.4, 365 N.J.Super. 255, 264, *726 839 A.2d 60 (App.Div.2003) (citations omitted).

V

THE VALIDITY OF THE REGULATION
Appellants note that when ECRA was adopted in 1983, the Legislature directed the DEP to promulgate "minimum standards for soil, groundwater and surface water quality necessary for the detoxification of the site of an industrial establishment ... to ensure that the potential for harm to public health and safety is minimized to the maximum extent practicable...." L. 1983, c. 330, § 5 (emphasis added). By comparison, they note that in the 1997 Brownfield Act the underlined language was changed: the DEP was to develop minimum remediation standards that reduced the potential for harm to public health and safety to "acceptable levels." N.J.S.A. 58:10B-12(a). Appellants argue plausibly that the change in language indicated a legislative intent to relax the remediation standards. But, the Legislature also stated in the Brownfield Act that "strict remediation standards are necessary to protect public health and safety and the environment," and directed that those "standards should be adopted based on the risk posed by discharged hazardous substances...." N.J.S.A. 58:10B-1.2 (emphasis added). And during the adoption of the Brownfield Act, the Senate Environment Committee stated that the law "will not lessen any environmental or health standard. The strict standards in the 1993 legislation and enforced by the ... DEP will remain in place." Senate Environment Committee, Statement to S.39 (June 5, 1997). Consequently, we are not convinced that the phrase "acceptable levels" required the adoption of relaxed remediation standards.
Furthermore, as appellants admit, when the Legislature called for "strict standards" it was "fully aware that [the] DEP had been promulgating [GWQS] since 1978...." It was also aware of DEP's water classification regulations, pursuant to which most of the State was declared to fall within Class IIA, areas that have water that is potable or potable with conventional treatment. N.J.A.C. 7:9-6.5(c), (e), and (f). (In fact, the section of the Brownfield Act that calls for investigation of the state aquifers declares that "[n]othing in this section shall be construed to require or obligate the department to reclassify the groundwater of any aquifer." N.J.S.A. 58:10B-21(d).) Appellants argue that if the Legislature intended use of the GWQS under the Brownfield Act, it would have said so. But the DEP responds that given the Legislature's awareness of the GWQS and the classification regulations, it would have declared that they not be used in this context if that had been its intent. Given the Legislature's failure to adopt Assemblyman Cryan's bill, supra, n. 4, which proposed amending the Brownfield Act to prohibit DEP's use of the GWQS in this context, and the relationship of the Brownfield Act to the other environmental laws, we cannot say the DEP's statutory interpretation is unsound.
The Brownfield Act also authorized the DEP to "develop differential remediation standards for surface water or groundwater that take into account the current, planned, or potential use of that water in accordance with ... the [WPCA]...." N.J.S.A. 58:10B-12(c)(2)(internal citations and footnote omitted). And it further provided that the legislative and administrative remediation standards would apply to remediation under, among other laws, the Spill Act, ISRA, and the WPCA. N.J.S.A. 58:10B-12(e). Since the same standards are to be used under all of those statutes, that certainly suggests that enforcement of *727 numeric standards under the Brownfield Act should be the same as enforcement of those standards under the WPCA.
Furthermore, the regulation does not simply incorporate the GWQS, as appellants suggest. Rather, it adds the narrative standards, which comply with the Brownfield Act's direction for site specific remediation standards by permitting, among other things, "natural remediation" when "appropriate [.]" N.J.A.C. 7:26E-1.13(b)(2)(vii)(6). And it also provides for deviation from the GWQS when "current scientific information indicates that a specifically listed numeric criterion is no longer appropriate." N.J.A.C. 7:26E-1.13(b)(1)(iii).
Appellants' criticism of the regulation includes claims that the DEP failed to base its standards "on generally accepted and peer reviewed scientific evidence or methodologies[,]" as required by N.J.S.A. 58:10B-12(b)(1); and on "reasonable assumptions of exposure scenarios[,]" as required by N.J.S.A. 58:10B-12(b)(2). They also argue that the Department failed to "avoid the use of redundant conservative assumptions[,]" as required by N.J.S.A. 58:10B-12(b)(3). In that regard, one of the appellants states explicitly what the other implies; namely, that "[t]his court need not review for itself the scientific literature in human toxicology and related disciplines to conclude that what was `generally accepted' in 1987, or in 1993, was no longer `generally accepted' in 2003."
We have included above the DEP's administrative explanation of why it believes the regulation satisfies each of the above cited statutory sections. Although appellants make plausible arguments, the DEP's responses also have merit; and it is, as we have noted, precisely on such points, involving, as they do, complex technical matters, that judicial deference to the agency is appropriate. New Jersey State League of Municipalities, supra, 158 N.J. at 222, 729 A.2d 21. Since the appellants arguments are merely plausible, and not clearly convincing, we will not interfere with the DEP's determination on these scientific matters.
If the deference principles set forth under Section IV of this opinion are to be meaningful, this is clearly a case in which we ought to defer to the administrative agency. We are dealing with a new statute that concerns highly specialized and technical matters that have been submitted in broad terms to the expertise of the enforcing agency. Although some of appellants' arguments are plausible, plausibility is not enough to carry the day. Appellants have not met their burden of proving that the regulation violates the statute.[5]
Affirmed.
NOTES
[1] Throughout the legislative and administrative materials, the phrase "ground water" is sometimes written "groundwater." Both usages are acceptable. Webster's Unabridged Dictionary of the English Language 844 (2d ed.2001). We will use the former except when the latter appears in quotation in those materials.
[2] Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.A. §§ 9601 to 9675.
[3] Safe Drinking Water Act, N.J.S.A. 58:12A-1 to -37.
[4] On June 30, 2003, Assemblyman Joseph Cryan introduced a bill proposing, in part, to amend N.J.S.A. 58:10B-12, to provide that the Department's "use of groundwater quality standards as minimum groundwater remediation standards at all sites is neither consistent with the legislative intent nor the statutory requirements...." A. 3899, 2003 Leg. (N.J.). The bill was referred to the Assembly Regulatory Oversight Committee, but was not enacted.
[5] FPE alone argues that the DEP violated the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -25, because it failed to perform a federal standards analysis and an economic benefit analysis, and because it failed to respond in a meaningful way to public comment. After carefully considering the record and briefs, we are satisfied that these arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). However, we will comment briefly. In Fed. Pac. Elec. Co. v. New Jersey Dep't of Envtl. Prot., 334 N.J.Super. 323, 344, 759 A.2d 851 (App.Div.2000), we concluded "that the Department had complied with the federal standards review requirement in adopting both the Technical Rules and the GWQS because it included a written statement, and because there are no federal groundwater standards." Nothing of substance has changed since then. The Department complied with its obligation to provide an economic impact statement, N.J.A.C. 1:30-5.1(c)(3), 34 N.J.R., supra, at 184; and it clearly responded at length to the public submissions opposing the regulation.