874 A.2d 586

SJC BUILDERS, LLC, A LIMITED LIABILITY COMPANY OF THE STATE OF NEW JERSEY, APPELLANT, v. STATE OF NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 3, 2005—Decided June 6, 2005.

Before Judges STERN, COBURN and S.L. REISNER.

*Michael T. Shivietz* argued the cause for appellant (*Sears, Sweeney & Marcickiewicz*, attorneys; *Mr. Shivietz*, on the brief).

*William A. Schnurr*, Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey*, Attorney General, attorney; *Michael J. Haas*, Deputy Attorney General, of counsel; *Lisa A. Runyon*, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

S.L. REISNER, J.A.D.

Plaintiff, SJC Builders, LLC (SJC), appeals from a final determination of the New Jersey Department of Environmental Protection (DEP) requiring the company to obtain a New Jersey Pollution Discharge Elimination System (NJPDES) permit for a proposed housing development. We affirm.

I

SJC owns property designated as lots four and six in Randolph Township, which the company intends to develop into Heritage 55, an age-restricted community consisting of thirty-one separate housing units. SJC planned to subdivide the property into eight smaller lots and build several units on each lot. According to SJC's proposed plan, each subdivision would share an individual subsurface sewage disposal system and each of the eight sets of units would be individually governed by a separate condominium association. The individual condominium associations would retain

responsibility for the operation of the disposal system on each subdivided lot as well as other shared elements of the buildings on the individual lots. However, all of the subdivisions would be governed by a master property owners association for the entire development. The master association would be responsible for, among other things, the stormwater management system for the entire development. There is no dispute that SJC proposed this entire structure in an effort to avoid having to obtain a NJPDES permit for its overall sewage disposal system.

SJC submitted a development application to the Randolph Township Planning Board with this proposed structure of condominium governance. The Planning Board granted preliminary and final major site plan and subdivision approval.

After the Planning Board granted subdivision approval, SJC sought a permit for the installation of individual septic systems from the Randolph Township Health Officer pursuant to *N.J.A.C.* 7:9A, Standards for Individual Subsurface Sewage Disposal Systems. These regulations "prescribe[ ] standards for the location, design, construction, installation, alteration, repair and operation of individual subsurface sewage disposal systems." *N.J.A.C.* 7:9A–1.2. However, the regulations prohibit "the use of a subsurface sewage disposal system for more than one property ... unless a treatment works approval or a NJPDES permit had been issued by the [DEP]." *N.J.A.C.* 7:9A–1.6(c). The term "property" is not defined under *N.J.A.C.* 7:9A. The regulations also limit local approval to systems discharging up to 2,000 gallons of sewage per day. *N.J.A.C.* 7:9A–1(a). While each of the eight individual septic systems in SJC's proposed development would only discharge 2,000 gallons or less per day, the development as a whole would discharge 6,200 gallons per day.

By letter dated July 29, 2003, the township health officer referred the matter to the DEP to determine whether a NJPDES permit was required for the proposed development. After reviewing the application including the site plan, septic design and design calculations for one of the proposed systems, the DEP advised the

township health department that SJC was required to apply for a NJPDES permit. The agency's August 14, 2003 letter stated:

The [DEP] has reviewed the information submitted and has determined that the total design flow of the property is greater than 2,000 gallons per day and the sewage disposal facilities can not be approved by your office. Approval for systems with total design flows of greater than 2,000 gallons per day must be approved by the Department through the NJPDES process. This determination is based upon the Department's working definition of "property" which means:

1. A single lot as defined by municipal lot and block or right of way (unless paragraph 2, below, applies); or

2. The combined area contained within the legal boundaries of two or more contiguous lots where, for any part of each of those lots, there is a shared pecuniary, possessary or other substantial common interest by one or more persons (such as common ownership and/or operation or a common plan of development or sale).

Since there is a common plan of development, the total property will exceed 2,000 gallons per day. It is also curious that two separate types of homeowner associations are planned for the facility. One for each group sharing a septic system and a larger one encompassing all the units. Other observed shared pecuniary interests included shared stormwater management facilities and visitor parking areas.

Based on this reasoning, DEP advised the township department of health that SJC's development required a NJPDES permit.

On September 19, 2003, SJC filed a motion with the DEP for reconsideration of the agency's determination. The DEP denied SJC's application for reconsideration and reaffirmed that SJC was required to apply for a NJPDES permit before installing a sewage disposal system. The DEP gave the following reasons in its December 22, 2003 written decision on reconsideration:

The Department is concerned that the complex institutional management structure established for this development, deviates significantly from the common institutional models used for other developments in New Jersey. It appears that the sole purpose of this structure is to procure individual septic approvals for each lot under The Standards for Individual Subsurface Sewage Disposal Systems (*N.J.A.C.* 7:9A—Chapter 199) rather than seek a permit for the entire development under the NJ Pollutant Discharge Elimination System (NJPDES) Program. Therefore, based upon the above information, and the Department's previous letter dated August 14, 2003, the Department has determined that the subject development is subject to the requirements of the NJPDES Regulations (*N.J.A.C.* 7:14A), and also requires a Plan Amendment to the Northeast Water Quality Management (WQM) Plan.

SJC appeals from this agency determination, contending that each of its proposed subdivisions constitutes a single property which qualifies for local rather than State permitting, and that the DEP cannot use its "working definition" of the term "property" without promulgating an amendment to its NJPDES regulations.

## II

■ The Legislature has entrusted to the DEP the enforcement of a complex system of water pollution control. *See In re Adoption of N.J.A.C. 7:26E–1.13,* 377 *N.J.Super.* 78, 871 *A.*2d 711 (App.Div.2005). We will ordinarily defer to an agency's construction of its enabling statute and its regulations, particularly where the Legislature has relied on the agency's expertise in enforcing a complex regulatory scheme. *See GE Solid State, Inc. v. Dir., Div. of Taxation,* 132 *N.J.* 298, 306, 625 *A.*2d 468 (1993); *Koch v. Dir., Div. of Taxation,* 157 *N.J.* 1, 8, 722 *A.*2d 918 (1999). Accordingly, we give deference to DEP's construction of the Water Pollution Control Act and to the agency's construction of its NJPDES regulations adopted pursuant to the Act. *See New Jersey Builders v. Dep't of Envtl. Prot.,* 169 *N.J.Super.* 76, 89–90, 404 *A.*2d 320 (App.Div.), *certif. denied,* 81 *N.J.* 402, 408 *A.*2d 796 (1979). *See also In re Adopted Amendments to N.J.A.C. 7:7A–2.4,* 365 *N.J.Super.* 255, 264, 839 *A.*2d 60 (App.Div.2003) (upholding amendments to freshwater wetlands regulations); *Adoption of N.J.A.C. 7:26E– 1.13, supra,* 377 *N.J.Super.* at 99–101, 871 *A.*2d 711 (upholding regulations setting groundwater clean-up standards at brownfields sites).

With that standard of review in mind, we turn to the governing statute and its purpose. The Water Pollution Control Act was intended to implement "the policy of this state to restore, enhance and maintain the chemical, physical, and biological integrity of its waters...." *N.J.S.A.* 58:10A–2. *See Adoption of N.J.A.C. 7:26E– 1.13, supra,* 377 *N.J.Super.* at 87, 871 *A.*2d 711. To that end the Act created the NJPDES permit system to regulate sewage treatment systems and other potential sources of water pollution,

*N.J.S.A.* 58:10A–3(j), and authorized the DEP to adopt implementing regulations. *N.J.S.A.* 58:10A–4.

Consistent with the Act, the NJPDES regulations define their purpose as follows:

> This subchapter establishes a system of controls to ensure that underground injection practices do not endanger underground sources of drinking water (USDWs). The goal of this subchapter is preventive. *The Department's policy is to liberally interpret and enforce this subchapter to prevent the contamination of the State's ground water resources.*
>
> [*N.J.A.C.* 7:14A–8.1(a) (emphasis added).]

The regulations define which sewage treatment facilities (also known as "injection wells") require a NJPDES permit:

> The following injection wells are among the injection activities regulated under this subchapter:
>
> . . . .
>
> iv. *Any one subsurface disposal system or multiple subsurface disposal systems, on a single property,* for which the aggregate sanitary wastewater design flow is in excess of 2000 [gallons per day], calculated in accordance with the minimum standards for average facilities listed in the Department's Standards for Individual Subsurface Sewage Disposal Systems, at *N.J.A.C.* 7:9A–7.4. . . .
>
> [*N.J.A.C.* 7:14A–8.1(b) (emphasis added).]

The NJPDES regulations define "property" as follows:

> *"Property"* means, for the purposes of *N.J.A.C.* 7:14A–8.1(b)iv, *all the contiguous block(s) and lots(s), including vacant land owned or otherwise under the control of the owner or operator* of the regulated facility, upon which a discharge is conducted or controlled as a result of the operation of a facility.
>
> [*N.J.A.C.* 7:14A–1.2 (emphasis added).]

"Facility" is defined as including a "treatment works treating domestic sewage." *Ibid.*

The DEP regulations permit a local department of health to approve the installation of individual sewage disposal systems, by issuing an Individual Subsurface Sewage Disposal System Permit, under limited circumstances:

> A system serving one or more dwelling unit on one individual property where the total daily volume of sewage generated, calculated as prescribed in *N.J.A.C.* 7:9A–7.4, is no greater than 2,000 [gallons per day] and the type of waste discharged consists of sanitary sewage only. . . .
>
> [*N.J.A.C.* 7:9A–1.8(a)1.]

A sewage disposal system that generates more than 2,000 gallons of sewage per day requires a NJPDES permit, which must be issued by the DEP. *N.J.A.C.* 7:9A–3.10; *N.J.A.C.* 7:14A–8.1.

SJC contends that the agency's "working definition" of the term "property" is an unauthorized expansion of the definition found in the NJPDES regulations, and that the agency cannot use the definition without amending its regulations. *See Metromedia, Inc. v. Dir., Div. of Taxation,* 97 *N.J.* 313, 331–32, 478 *A.*2d 742 (1984); *Woodland Private Study Group v. State of New Jersey Dep't of Envtl. Prot.,* 109 *N.J.* 62, 65, 533 *A.*2d 387 (1987). However, we conclude that the DEP's working definition is a reasonable construction of its existing regulations and does not implicate *Metromedia* principles. As illustrated by this case, having "a common plan of development," as set forth in the working definition, is a form of "control" by the property owner for purposes of the regulatory definition of property.

We note that the definition of "property" in *N.J.A.C.* 7:14A–1.2 is somewhat ambiguous, in that the applicant must seek the permit before building the system and yet the term "property" is defined as all of the land under unitary ownership upon which the discharge "is" conducted. Obviously the permit will be sought at a time before the discharge "is" conducted. Therefore, in context, it is reasonable to construe the term "is" as meaning "will be," and it is likewise reasonable to consider the ownership of the property at the time of the permit application. Ownership plans may change. The only certainty, from a regulatory perspective, is the property's current ownership.

Consequently, we do not regard as dispositive the fact that, at some point in the future, the properties would be subdivided and placed in separate condominium ownership. At the time of the application, the property was in common ownership, and the septic systems were being planned as part of one housing development of thirty-one units. Thus, it was reasonable to consider the total amount of sewage to be discharged by the overall development. Moreover, under the proposed development plan, each separate

set of buildings would have a separate property owners association to maintain the septic system and other common areas on that property, while a master association would be responsible for overall management of the entire development including the storm water management system. Therefore, the DEP could also reasonably conclude that both before and after construction, the entire housing complex would be under unitary control thereby justifying its treatment as one "property." *See N.J.A.C.* 7:14A–1.2. *Compare Bunting v. Sheehan,* 156 *N.J.Super.* 14, 17–18, 383 *A.*2d 429 (App.Div.1976) (applying the Hotel and Multiple Dwelling Law to several multi-unit row house structures separated by firewalls but under common ownership).

As more fully articulated in its decision on reconsideration, the DEP properly perceived the applicant's plan as an attempt to circumvent the NJPDES regulations. Requiring this applicant to obtain a NJPDES permit was consistent with the purpose of the existing regulations, and, more importantly, was consistent with the fundamental purpose of the statute to protect water quality by ensuring that building projects involving the discharge of large amounts of sewage are subject to DEP oversight.

We also perceive no unfairness in permitting the agency to apply its NJPDES rules to this development. This case presents a different situation from, for example, *State of New Jersey, Dep't of Envtl. Prot. v. M.J. Stavola,* 103 *N.J.* 425, 511 *A.*2d 622 (1986), where the Supreme Court held that the agency could not apply the Coastal Area Facility Review Act (CAFRA) to beach cabanas, because the CAFRA regulations did not by their terms apply to cabanas, the plaintiff developer could not have reasonably anticipated that it would need a CAFRA permit to build the cabanas, and the structures were largely built already. *Id.* at 434–36, 511 *A.*2d 622. Here, by contrast, the application of the NJPDES regulations to the developer's proposed housing complex is a logical outcome in light of the language and purpose of the rules.

At oral argument, the appellant's counsel candidly conceded that the project was structured as it was solely to avoid the application

of the NJPDES regulations. And even if he had not so conceded, we would agree with the DEP that the proposed project governance structure permits no other conclusion. Further, unlike *Stavola*, the developer was not prejudiced by the application of the regulations. The Township immediately perceived that the project might need a NJPDES permit, and the issue was resolved by the DEP before any construction commenced. Hence, while the developer was not rewarded for its creativity in trying to avoid application of the NJPDES regulations, it was not unfairly disadvantaged either.

If we were to accept appellant's argument, the thirty-one unit development would be permitted to discharge 6,200 gallons of sewage per day without meeting the standards of the NJPDES permitting system. This result would be contrary to the purpose of the Water Pollution Control Act and the NJPDES regulations to protect the waters of this State from pollution.

Since the DEP's determination represents a reasonable construction of the agency's existing regulations, we reject SJC's contention that the DEP improperly engaged in ad hoc decisionmaking instead of rulemaking.[1] *See Metromedia, supra,* 97 *N.J.* at 330–32, 478 *A.*2d 742.

Affirmed.

---

[1] In this case, the DEP's "working definition" of property was a logical construction of the agency's somewhat ambiguous existing regulation. The agency has proposed an amended regulation that would clarify the definition of "property," although we were advised at oral argument that the regulation has not yet been adopted.