**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1684-14T2

MARK SMITH and KATHERINE SMITH,

     Appellants,

v.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

     Respondent.

_____

Argued November 2, 2017 — Decided December 1, 2017

Before Judges Simonelli, Haas and Rothstadt.

On appeal from New Jersey Department of Environmental Protection.

Bruce I. Afran argued the cause for appellants.

Elspeth L. Faiman Hans, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Ms. Hans, on the brief).

PER CURIAM

    Appellants Mark and Katherine Smith appeal from the New Jersey

Department of Environmental Protection's (DEP's) October 23, 2014

grant of a Soil Remediation Action Permit (the Permit) to the Trustees of Princeton University (the University) in connection with a soil remediation project it completed under the supervision of a Licensed State Remediation Professional (LSRP) pursuant to the Site Remediation Reform Act (SRRA), N.J.S.A. 58:10C-1 to -28. The Permit established the monitoring, maintenance, and evaluation requirements the University had to meet in the future in order to ensure that its remedial action continued to be protective of the public health, safety, and environment. We affirm.

## I.

We begin by providing a brief overview of the regulatory changes the SRRA made to the way contaminated sites are remediated in New Jersey following its enactment in 2009, and its full implementation in 2012. Prior to the SRRA, the party responsible for contaminating a site was required to remediate the problem on their property under DEP's strict supervision. The responsible party had to notify DEP of the contamination and DEP would inspect the property, decide how the contamination would be remediated, supervise the remediation as it proceeded and, at the conclusion of the project, determine whether the remediation had ameliorated the problem. See generally N.J.S.A. 13:1K-6 to -14 (the Industrial Site Recovery Act); N.J.S.A. 58:10B-1 to -31 (the Brownfield and Contaminated Site Remediation Act).

The SRRA completely changed the remediation paradigm. "In 2009, the Legislature enacted SRRA, in an effort to further improve the efficiency and speed with which environmental sites are remediated." Des Champs Labs, Inc. v. Martin, 427 N.J. Super. 84, 99 (App. Div. 2012). Under SRRA, DEP no longer directly supervises the remediation efforts at a contaminated site. Morristown Assocs. v. Grant Oil Co., 220 N.J. 360, 378 n.5 (2015). Instead, SRRA shifted primary supervision for site cleanup of contaminants from the DEP to certified specialists known as LSRPs. Des Champs, supra, 427 N.J. Super. at 99.

Following the enactment of SRRA, a responsible party must hire a LSRP to supervise the remediation of a site in accordance with DEP's regulations. N.J.S.A. 58:10B-1.3(b)(1). LSRPs "are individuals who independently oversee the cleanup of contaminated sites, ensuring that the process is conducted effectively and in compliance with New Jersey statutes and regulations." Magic Petroleum Corp. v. Exxon Mobil Corp., 218 N.J. 390, 400 n.2 (2014).[1]

The remediation activities proceed "without prior approval from DEP." Morristown Assocs., supra, 220 N.J. at 378 n.5; see

---

[1] The New Jersey Site Remediation Professional Licensing Board is responsible for establishing licensing requirements for LSRPs. N.J.S.A. 58:10C-3(a). The Board adopted these standards in January 2016. N.J.A.C. 7.26I-1.1 to -9.3.

also N.J.S.A. 58:10B-1.3(b)(3). When the LSRP is satisfied that the site has been remediated in accordance with all applicable statutes and regulations, the LSRP issues a Response Action Outcome (RAO)[2] to the responsible party certifying its compliance with the law. Matejek v. Watson, 449 N.J. Super. 179, 182 (App. Div. 2017); see also N.J.S.A. 58:10C-14(d); N.J.A.C. 7:26C-2.3(a); N.J.A.C. 7:26B-1.10.[3]

In some cases, the LSRP will determine that the best "[e]ngineering control" to remediate contamination on a site is to leave it in place or congregate it in one area of the property and then "cap" it. N.J.A.C. 7:26E-1.8. A cap is a protective barrier that is placed over contaminated material in order to safely contain and control the material in one location. "[W]here the residual contaminant concentrations remaining [on the site after the contamination is capped] exceed the [applicable] residential direct contact soil remediation standards[,]" N.J.A.C. 7:26E-5.2(a)(4), the responsible party and the LSRP must file and

---

[2] A RAO has the same legal effect as "a covenant not to sue" had with regard to property that was remediated under the Industrial Site Recovery Act before LSRPs took over this responsibility. N.J.S.A. 58:10B-13.2(a).

[3] When the Legislature enacted SRRA in 2009, it also amended the Brownfield and Contamination Site Remediation Act to require use of an LSRP to perform the remediation, to provide notice to the DEP, and to pay fees and oversight costs, among other requirements. N.J.S.A. 58:10B-1.3(b)(1)-(9).

record a deed notice "with the office of the county recording officer, in the county in which the property is located[.]" N.J.S.A. 58:10B-13(a)(2). The deed notice acts

> to inform prospective holders of an interest in the property that contamination exists on the property at a level that may statutorily restrict certain uses of or access to all or part of that property, a delineation of those restrictions, a description of all specific engineering or <u>institutional controls at the property that exist and that shall be maintained in order to prevent exposure to contaminants remaining on the property</u>, and the written consent to the notice by the owner of the property.
>
> [Ibid. (emphasis added).]

After the LSRP files the deed notice with the county, he or she must submit an application to DEP for the issuance of a remedial action permit, which sets the "institutional controls" that the responsible party must maintain to ensure that the environmental control selected by the LSRP, in this example a cap, continues to "prevent exposure to contaminants remaining on the property[.]" Ibid.; see also N.J.A.C. 7:26C-7.5(b) (describing the documentation that must be submitted to DEP with the application). The controls and conditions that may be included in a permit are set forth in N.J.A.C. 7:26C-7.7 ("[g]eneral conditions applicable to all remedial action permits"), and N.J.A.C. 7:26C-7.8 ("[s]pecific conditions applicable to soil

remedial action permits"). As aptly described in the general language contained in each permit, a remedial action "permit is the regulatory mechanism used by [DEP] to help ensure that [the responsible party's] remedial action will be protective of human health and the environment."

After a remediation action permit is granted, the LSRP may issue the RAO to the responsible party "[w]hen, in the opinion of the [LSRP], the site or area of concern has been remediated[.]" N.J.A.C. 7:26C-6.2(a). If the responsible party thereafter fails to maintain the remediation controls required by the permit, DEP may take appropriate enforcement action, including the imposition of civil administrative penalties, against that party. N.J.A.C. 7:26C-9.1 to -9.10.

To summarize, under SRRA, DEP's role in the remediation process has been drastically minimized. Prior DEP approval is not needed for the remediation action. Instead, site cleanups are initiated and completed under the direction of a LSRP, who has responsibility for oversight of the environmental investigation and remediation of the problem at a site. DEP receives the LSRP's reports as the project progresses and remediation milestones are reached. In some cases, DEP is required to issue a remedial action permit that establishes long-term monitoring and reporting requirements as "institutional controls" designed to ensure that

the remedial actions and environmental controls chosen by the LSRP continue to be protective of the public health, safety, and environment in the ensuing years.

## II.

With this essential regulatory background in mind, we now turn to the facts of the present case. Since 2003, the University has been interested in developing the "Princeton Nurseries" site, a large parcel of land it owned in South Brunswick.[4] In 2007, the University retained a consultant, Ransom Environmental (Ransom), to investigate whether there was any contamination on Block 99, Lot 14, a seventy-four-acre portion of the site.

This lot had previously been used for nursery and farming operations and contained two pesticides that had contaminated the soil. Ransom's soil sample tests "identified dieldrin as the primary contaminant concern in [the] soil as a result of historic pesticide use" on the property. According to materials in the record, "[d]ieldrin is an organochlorine pesticide that was historically used against insects on field, forage, vegetable, and fruit crops." The United States Environmental Protection Agency

---

[4] The history of this development process is set forth in detail in our recent unpublished opinion in Smith v. South Brunswick Twp., Nos. A-1218-15 and A-3014-15 (App. Div. May 18, 2017) (slip op. at 3-17) and, therefore, it need not be repeated here.

(EPA) banned dieldrin's use on food crops in 1974, and banned this substance entirely in 1987.

Ransom also detected a contaminant known as "chlordane" on other portions of the site. "Chlordane is a mixture of compounds used on a wide variety of crops and on home lawns and gardens from 1948 to 1988. From 1983 to 1988, chlordane's only permitted use was for termite control, and the [EPA] banned all use starting in 1988." Ransom determined that "all locations impacted by chlordane [on the site] were also impacted by dieldrin."

In 1999, the DEP Commissioner created "the Historic Pesticide Contamination Task Force to help [DEP] identify technically and economically viable alternative strategies that will be protective of human health and the environment for sites with contamination due to historical use of pesticides." Historic Pesticide Contamination Task Force, Findings and Recommendations for the Remediation of Historic Pesticide Contamination, Final Report, 1 (1999),www.state.nj.us/dep/special/hpctf/final/hpctf99.pdf (last visited Nov. 8, 2017). The Task Force explained that pesticides like dieldrin and chlordane "become tightly bound to soil particles so that migration of the contaminant down deeper into the soil is limited." Id. at 9. The Task Force also concluded that "organochlorine pesticides are not particularly water soluble and therefore pose minimal threat to ground water." Ibid.

A-1684-14T2

In 2008, Ransom submitted a remedial investigation report and remedial action work plan to DEP outlining its findings. DEP reviewed Ransom's remediation plan, which proposed the construction of a land berm to cap the contamination, and approved the plan in 2012.

However, the University did not proceed with the remediation. Instead, it decided to sell a 7.369 acre portion of its property, known as Area 3 of Lot 14, to PSE&G, which planned to construct an electrical substation on the site. Smith, supra, (slip op. at 8-9). Due to the pending sale of the property,[5] the University again retained Ransom to conduct a further study to determine the best means of remediating the contamination caused by the pesticides still bound to the soil. Because SRRA was now fully effective, Ransom engaged Kenneth Goldstein, a professional engineer and LSRP, to be responsible for, and oversee, the remediation.[6]

As detailed in its August 2014 Remedial Investigation Report Addendum and Remedial Action Report (the August 2014 report), Ransom conducted further tests of the site and again found

_____

[5] PSE&G "completed the purchase and acquired title to the property on May 29, 2015." Smith, supra, (slip op. at 8).

[6] For ease of reference, we collectively refer to Ransom and Goldstein as "Ransom."

pesticide contamination caused by the historic agricultural activities conducted on the property. Based upon its review, Ransom decided to proceed to cap the contaminants in a land berm.

As required by N.J.A.C. 7:26C-1.7(h)(2), Ransom sent letters to each property owner and tenant who resided within 200 feet of the contaminated site to notify them of the site conditions that led to the determination to excavate the contaminated soil from the property and consolidate it into a berm. Appellants received a copy of this April 25, 2014 notification, but took no action at that time.

Ransom then proceeded to remediate the site. As noted above, Ransom conducted this remediation without DEP's prior approval. N.J.S.A. 58:10B-1.3(b)(3). During the project, Ransom excavated 9547 cubic yards of contaminated soil and consolidated it "into a berm adjacent to the northwest side of the PSE&G parcel." South Brunswick Township (the Township) required Ransom to build the 400-foot by 100-foot berm at least ten feet high "to protect the views of residences located along Ridge Road to the north" of the PSE&G property. As Ransom stated in its August 2014 report, the "placement of the impacted soils into a berm at this location allowed remediation of both the proposed PSE&G parcel and berm area, while also meeting the Township requirement to construct a berm at this location."

Prior to constructing the berm, Ransom covered the berm area "with a permeable geotextile fabric to demarcate the pre-existing grade from the imported soils." The workers then placed the contaminated soil on the fabric, spread it with a bulldozer, and "rolled [it] in lifts for compaction." The contaminated soil was next "covered with an orange, permeable geotextile fabric to demarcate the boundary between the impacted and the overlying clean soil cap." The cap consisted of 1540 cubic yards of certified clean soil "at a minimum thickness of [twelve] inches." Ransom then "hydroseeded" the berm with a blend of grass seed to prevent erosion.

Because the capped contamination "exceeded [applicable] residential direct contact soil remediation standards[,]" Ransom filed a deed notice with the Middlesex County Clerk's Office on August 14, 2014. See N.J.A.C. 7:26E-5.2(a)(4). As explained in Ransom's August 2014 report, this deed notice would "serve as an institutional control to restrict access to the impacted soil and to provide long-term protection of the engineered capping system." After filing the deed notice, Ransom submitted its application for a Soil Remedial Action Permit Application to DEP, together with a copy of its August 2014 report, the deed notice, and all other required documentation. See N.J.A.C. 7:26C-7.5(b).

During this period, appellants were contesting PSE&G's efforts to build an electrical substation on the parcel of land it purchased from the University. Smith, supra, (slip op. at 2-3). Seeking to open another front in their attack on the substation project, appellants submitted a request to DEP in September 2014 under the Open Public Records Act, N.J.S.A. 47:1A-1 to -13 (OPRA), for all documents in the agency's possession concerning Ransom's and the University's remediation of the site. DEP fully complied with this request. Thereafter, appellants assert they spoke to a DEP employee by telephone on two occasions to express their opposition to the remediation of the contaminants on the property.

On October 23, 2014, DEP issued the Permit to the University. In the Permit, DEP directed the University to comply with the general and specific conditions set forth in N.J.A.C. 7:26C-7.7 and N.J.A.C. 7:26C-7.8. Among other things, the University was required to: conduct periodic inspections, monitoring, and maintenance of the berm; prepare and submit a Remedial Action Protectiveness/Biennial Certification Form to DEP every two years; and hire a LSRP "to prepare and certify that the remedial action

continues to be protective of the public health and safety and the environment." This appeal followed.[7]

                                    III.

On appeal, appellants assert that DEP improperly granted the Permit because: (1) the written notification Ransom provided to nearby property owners about the remediation project was inadequate; (2) Ransom's application for the Permit "failed to identify the potable wells on the neighboring residences as required by DEP remediation regulations"; (3) Ransom did not identify and report a State park known as the "Cook Natural Area" in the application; and (4) Ransom's and the University's construction of the berm violated the Township's zoning ordinances. All of these contentions lack merit.

"Established precedents guide our task on appeal. Our scope of review of an administrative agency's final determination is limited." Capital Health Sys. v. N.J. Dep't of Banking & Ins., 445 N.J. Super. 522, 535 (App. Div.), (citing In re Stallworth, 208 N.J. 182, 194 (2011)), certif. denied, 227 N.J. 381 (2016).

_____

[7] Throughout their brief, appellants state they are challenging DEP's "approval of the berm." As discussed above, however, Ransom completed the berm without any prior DEP approval, and the Permit issued by DEP on October 23, 2014, which is the only agency action involved in this appeal, merely established institutional controls that the University had to employ in the future to ensure the continued protectiveness of the remedy chosen by Ransom to address the contamination on the site.

We will not upset the ultimate determination of an agency unless it is shown it was arbitrary, capricious, or unreasonable, or that it violated legislative policies expressed or implied in the statutes governing the agency. Seigel v. N.J. Dep't of Envtl. Prot., 395 N.J. Super. 604, 613 (App. Div.), certif. denied, 193 N.J. 277 (2007). "The fundamental consideration in reviewing agency actions is that a court may not substitute its judgment for the expertise of an agency so long as that action is statutorily authorized and not otherwise defective because [it is] arbitrary or unreasonable." In re Distrib. of Liquid Assets, 168 N.J. 1, 10 (2001) (citation omitted).

Where an agency's expertise is a factor, we will defer to that expertise, particularly in cases involving technical matters within the agency's special competence. In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 489 (2004). This deference is even stronger when the agency, like DEP, "has been delegated discretion to determine the specialized and technical procedures for its tasks." City of Newark v. Natural Res. Council in the Dep't of Envtl. Prot., 82 N.J. 530, 540, cert. denied, 449 U.S. 983, 101 S. Ct. 400, 66 L. Ed. 2d 245 (1980). Moreover,

> [w]hen an administrative agency interprets and applies a statute it is charged with administering in a manner that is reasonable, not arbitrary or capricious, and not contrary to the evident purpose of the statute, that

interpretation should be upheld, irrespective of how the forum court would interpret the same statute in the absence of regulatory history.

> [Reck v. Dir., Div. of Taxation, 345 N.J. Super. 443, 448 (App. Div. 2001) (quoting Blecker v. State, 323 N.J. Super. 434, 442 (App. Div. 1999)), aff'd, 175 N.J. 54 (2002)]

Applying these principles, we discern no reason to disturb DEP's decision to grant the Permit to the University.

IV.

Appellants first argue that the written notice Ransom sent them on April 25, 2014 did not "adequately summarize the site conditions" or provide enough information about the remedial actions Ransom would perform on the site. We disagree.

N.J.S.A. 58:10B-24.3(a) states that "[a]ny person who is responsible for conducting a remediation of a contaminated site shall be responsible for notifying the public of the remediation of the contaminated site pursuant to rules and regulations adopted by" DEP. In accordance with this statute, DEP adopted N.J.A.C. 7:26C-1.7(h)(2), which in pertinent part provides that the responsible party shall

> [w]ithin 14 days prior to commencing field activities associated with the remedial action, provide notification to any local property owners and tenants who reside within 200 feet of the contaminated site, and to the [municipal clerk of each municipality in which the site is located, the county health

15

department, and the local health agency]. The notification shall summarize site conditions and describe the activities that are to take place to remediate the site and shall either be in the form of written correspondence or the posting of a sign visible to the public, which shall be located on the boundaries of the contaminated site.

On its website, DEP has published additional guidance about the content of the written notifications required by N.J.A.C. 7:26C-1.7(h)(2). N.J. Dep't of Envtl. Prot., Guidance for Sending Notification Letters, 222 nj.gov/dep/srp/guidance/public_notification/letters.htm (last visited Nov. 8, 2017). This guidance instructs that

[t]he [notification] letter must summarize site conditions and describe activities that are to take place to remediate the site. The letter must also include contact information for both the person responsible for conducting the remediation and the [LSRP] of record for the site.

Although no additional wording is required, the following is recommended for inclusion in the letters:

[1]  Name and address of site[.]

[2]  Tax block and lot[.]

[3]  The Department's Preferred ID number as provided in the most recent edition of the "Department's Known Contaminated Sites in New Jersey" report found at http://www.nj.gov/dep/srp/kcs-nj/ .

[4] Description of contaminants detected, in common language and environmental media affected[.]

[5] Current remedial phase, date field activities are expected to begin, a schedule of future activities and hours of operation[.]

[6] Source of contamination and/or type of case[.]

[7] Statement that contamination has not left property of the discharge, if appropriate[.]

[8] Intended Reuse[.]

The issue of adequacy of notice is a question of law subject to our de novo review. Pond Run Watershed Ass'n v. Twp. of Hamilton Zoning Bd. of Adjustment, 397 N.J. Super. 335, 350 (App. Div. 2008). We have not previously construed the notification requirements imposed by N.J.S.A. 58:10B-24.3(a), the regulation implementing it, N.J.A.C. 7:26C-1.7(h)(2), or the DEP guidance discussed above. Under somewhat analogous circumstances, however, we have interpreted similar notice requirements included in the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -163.

For example, N.J.S.A. 40:55D-12(a) requires a municipality to provide public notice of hearings concerning zoning and land use permit applications. In cases involving this statute, we have routinely held that proper notice is a jurisdictional prerequisite to a land-use board's authority to conduct a hearing on an

17

application. Twp. of Stafford v. Stafford Twp. Zoning Bd. of Adjustment, 154 N.J. 62, 79 (1998); Perlmart of Lacey, Inc. v. Lacey Twp. Planning Bd., 295 N.J. Super. 234, 236 (App. Div. 1996). If the content of the notice is defective or those entitled to receive notice are not served, the notice is invalid and the board is not authorized to act on the application. Stafford, supra, 154 N.J. at 79.

N.J.S.A. 40:55D-11 establishes the required content for these notices. Similar to what DEP has required in its regulation in this case, N.J.S.A. 40:55D-11 states that the notice must

> state the date, time and place of the hearing, the nature of the matters to be considered and, . . . an identification of the property proposed for development by street address, if any, or by reference to lot and block numbers as shown on the current tax duplicate in the municipal tax assessor's office, and the location and times at which any maps and documents for which approval is sought are available [for review.]

We have interpreted N.J.S.A. 40:55D-11 to require "an accurate description of what the property will be used for under the application." Perlmart, supra, 295 N.J. Super. at 238 (citation omitted). To fulfill that prerequisite, the application must describe "the nature of the matters to be considered" in such a "common sense description of the nature of the application . . . that the ordinary layperson could understand its potential

impact upon him or her."  Id. at 236, 239; Shakoor Supermarkets, Inc. v. Old Bridge Twp. Planning Bd., 420 N.J. Super. 193, 201 (App. Div.), certif. denied, 208 N.J. 598 (2011).

Contrary to appellants' contention, the notice provided to property owners should not be overly technical.  As we observed in Perlmart,

> [w]hen a statute requires a notice to be given to the public, such a notice should fairly be given the meaning it would reflect upon the mind of the ordinary lay[person], and not as it would be construed by one familiar with the technicalities solely applicable to the laws and rules of the zoning commission.
>
> [Supra, 295 N.J. Super. at 238 (alteration in original) (citation omitted).]

Similarly, municipalities seeking to enact zoning ordinances must provide notice to the public.  In this regard, N.J.S.A. 40:49-2.1(a) states that these notices must cite the proposed ordinance by title, provide "a brief summary of the main objectives or provisions of the ordinance," advise that the ordinance is available for public examination, and set "the time and place for the further consideration of the proposed ordinance[.]"  In construing this notice requirement, we have held that "[a] notice of a proposed change in the zoning laws must be reasonably sufficient and adequate to inform the public of the essence and scope of the proposed changes."  Wolf v. Shrewsbury, 182 N.J.

Super. 289, 296 (App. Div. 1981), certif. denied, 89 N.J. 440 (1982). At a minimum, municipalities must substantially comply with statutory published notice requirements. Id. at 295. "Failure to substantially comply with the requirements of a statute requiring publication renders the ordinance invalid." Ibid.

Applying these principles to the notification requirement set forth in N.J.A.C. 7:26C-1.7(h)(2), we conclude that Ransom's April 25, 2014 letter was clearly sufficient and provided appellants with more than adequate notice of the remediation project. In the notification letter, Ransom stated:

> On behalf of The Trustees of Princeton University, I[8] am writing to inform you that the remediation of environmental contamination on a portion of the former Princeton Nurseries property located at 4405 US Route 1, in the Township of South Brunswick, New Jersey (Block 99, Lot 14) is planned to begin in May 2014. The work is being performed pursuant to rules established by the New Jersey Department of Environmental Protection (NJDEP). The NJDEP has assigned Site Remediation Program (SRP) Preferred Identification (PI) Number 462273 to the property.

Thus, the notification letter plainly advised appellants that remediation work was going to occur on the Princeton Nurseries property, and gave them the address and specific block and lot

---

[8] The notification letter was signed by Ransom's project manager.

number for the site. It also provided the identification number for the project.

The next section of the notification letter stated:

> The remediation is prompted by the presence of residual pesticide compounds in soil at concentrations above NJDEP cleanup criteria. These compounds are present as a result of historic agricultural activities. The impacted soil will be excavated and consolidated into a berm, which will then be capped with certified clean soil. This clean soil cap will serve as a control to prevent direct contact with and migration of the impacted soil. The investigation and remediation of the Site is being performed under the oversight of Mr. Kenneth Goldstein, P.E., a New Jersey Licensed Site Remediation Professional (LSRP) in accordance with New Jersey regulations and NJDEP guidance.

Based on this clearly-worded letter, appellants were made aware that the remediation was necessary because pesticides were found in the soil on the site. The letter explained that the pesticides were present on the land because the property had previously been used for agricultural activities. Ransom next explained that it was going to excavate the contaminated soil, consolidate that soil into a berm, and then cap the berm with clean soil in order to control the contamination and prevent it from migrating to another location. The letter also gave appellants the name of the LSRP Ransom retained to oversee the project.

The April 25, 2014 notification letter concluded by stating:

> Upon the request of the Township of South Brunswick, copies of pertinent environmental reports regarding the work will be made available to the Township.  Should you have any questions regarding the work, you can contact Mr. Curt Emmich of Princeton Forrestal Center at [the provided telephone number].[9]

Thus, appellants were advised before the project began that more technical environmental reports describing the work to be performed would be made available to the Township.  As noted above, appellants did not seek any further information about the remediation project until after Ransom completed the berm.

Under these circumstances, Ransom's notification letter provided an accurate, detailed description of the remedial project that would be undertaken in layperson's terms that fully met the requirements of N.J.A.C. 7:26C-1.7(h)(2).  Therefore, we reject appellants' contentions on this point.

V.

Appellants next assert that DEP should have denied the University's application because Ransom "failed to identify the potable wells on the neighboring residences as required by DEP remediation regulations."  Again, we disagree.

---

[9] As required by N.J.A.C. 7:26C-1.7(h)(2), Ransom sent a copy of the notification letter to the Township Municipal Clerk, the Township Health Officer, and the Middlesex County Health Department.

DEP's requirements for conducting a ground water receptor evaluation, which includes identification and sampling of potable and irrigation wells, are set forth in N.J.A.C. 7:26E-1.14 which, in pertinent part, states that "[t]he person responsible for conducting the remediation shall conduct a receptor evaluation of ground water when any contaminant is detected in ground water in excess of any [applicable] ground water quality standard[.]" N.J.A.C. 7:26E-1.14(a). The rest of the regulation repeats the instruction that "a well search to identify wells that may be impacted by contamination from the site" is only required if "ground water contamination is detected" on the site. N.J.A.C. 7:26E-1.14(a)(1); see also N.J.A.C. 7:26E-1.14(a)(2).

Here, Ransom performed "a site investigation of soil by sampling the soil in each potentially contaminated area of concern" as required by N.J.A.C. 7:26E-3.4(a). It also evaluated the site "to determine if there [was] the potential that ground water [had] been contaminated[.]" N.J.A.C. 7:26E-3.5(a). After conducting a complete evaluation of the soil contamination, Ransom determined that the requirement to identify wells in the area had not been triggered. As discussed above, neither of the pesticides found on the property was water soluble. As stated in Ransom's August 2014 report, it also determined that the consolidation of

contaminated soils in the berm would not cause any impact to ground water.[10]

In support of their contrary allegation, appellants mistakenly rely upon N.J.A.C. 7:26E-1.16(a)(1)(ii), which states that "[t]he person responsible for conducting the remediation shall conduct an ecological receptor evaluation [to] . . . [d]etermine if any environmentally sensitive natural resource, other than ground water . . . [is] adjacent to the site or area of concern[.]" (emphasis added). In this portion of their argument, however, appellants ignore the fact that this requirement only applies if the "environmentally sensitive natural resource" to be evaluated is something "other than ground water." As discussed above, Ransom determined following its comprehensive evaluation that the remedial action posed no danger to the ground water. Therefore, Ransom was not required to conduct a well search. N.J.A.C. 7:26E-1.14(a)(1).

VI.

Turning to appellants' next allegation, the University's permit application contained a section which asked, "Have any of

_____

[10] In its August 2014 report, Ransom noted that DEP only required that there be a four-foot buffer between contaminated soil in the berm and the seasonal high water table below. Here, the seasonal water table was "over [thirty] feet below grade."

the following been identified within 200 feet of the site boundary?"[11] In response, Ransom did not check off the box next to "Public parks and playgrounds." Appellants assert there was a public park within 200 feet of the site boundary called the Cook Natural Area, which they state "is a component of the Delaware & Raritan Canal State Park." Because Ransom did not check the box indicating the presence of this park in the vicinity, appellants contend that DEP issued the Permit based upon faulty information and, therefore, it must be vacated. This contention lacks merit.

From the schematic map Ransom included in its application materials, it does not appear to us that the Cook Natural Area is within 200 feet of the property boundary. Therefore, Ransom correctly left the box for "Public parks and playgrounds" unmarked.

However, even if the Cook Natural Area did fall within the 200-foot area, and Ransom therefore mistakenly failed to check the appropriate box, we discern no basis to vacate the Permit on this ground. As appellants candidly concede, the Cook Natural Area is specifically identified on the map included in the application materials. Therefore, DEP surely knew of its presence near the site when it considered the application.

---

[11] N.J.A.C. 7:26E-1.13(a)(2) requires the responsible party to identify every park that is located "within 200 feet of the property boundary."

In addition, Ransom's August 2014 report clearly states that the University property is bordered "by dedicated open space property and Delaware and Raritan (D&R) Canal State Park property to the west[.]" Appellants have not asserted that the D&R Canal State Park is located within 200 feet of the site. However, Ransom's specific mention of this parkland which, according to appellants, includes the Cook Natural Area, supports the conclusion that DEP was aware of nearby parks when it considered the application. Therefore, we reject appellants' contention.

## VII.

Finally, appellants unpersuasively argue that a "pollution containment berm is not a permitted use under the [Township] zoning ordinance that governs this site." Because N.J.A.C. 7:26E-5.1(d)(5) provides that a responsible party must comply "with applicable Federal, State, and local laws and regulations," appellants argue that the Permit should be vacated. This contention fails for several reasons.

First, appellants' argument ignores the fact that the University's "use" of the property did not change when it remediated the soil contamination on the site. As detailed in Ransom's August 2014 report, this contamination existed in the top soil on the site for decades. Thus, the fact that the

26                                          A-1684-14T2

contamination is now contained in a protective berm was not a change in "use" as appellants assert.

Moreover, appellants ignore S.B. Code[12] § 42-183(a), which permits a property owner to "move, deliver, fill, place, or remove soil or otherwise disturb, cause, allow, or permit material to be moved or placed on or removed from any property in the [T]ownship [after] obtaining approval from the soil conservation district and the [T]ownship zoning officer." Thus, the construction of a berm, especially one designed to protect the environment, was a permitted activity on the property.

Indeed, Ransom's August 2014 report specifically states that the Township required it to build the berm, and to build it at least ten feet high, which evidences the Township's awareness, and at least tacit approval, of the project.[13] Therefore, appellants have failed to demonstrate that the project violated any of the Township's zoning ordinances.

---

[12] We use the citation "S.B." to refer to the Township Municipal Code.

[13] Appellants do not assert that the University failed to obtain any appropriate permit from the Township prior to the construction of the berm. As set forth in S.B. Code § 42-195(6), another provision which appellants ignore, remediation projects are exempt from Section 42 requirements and, therefore, it is likely that no municipal permit was even required before Ransom constructed the berm.

Just as importantly, appellants never reported any alleged violation of a zoning ordinance to the Township's zoning officer. As we have recognized, conditions placed on the use of property by a zoning code "are not self-executing." Washington Commons v. Jersey City, 416 N.J. Super. 555, 561 (App. Div. 2010), certif. denied, 205 N.J. 318 (2011). If a party suspects that a violation has occurred, he or she should report the matter "to the zoning officer or other official of the municipality charged with the enforcement of the zoning . . . ordinance." Cox, N.J. Zoning & Land Use Administration § 19-6.8 (2017). If the municipality determines that a violation of a zoning ordinance has occurred, it "may institute a suit for injunctive relief or may institute any other appropriate action, including [filing a] complaint in the municipal court." Ibid. Nothing in the record establishes, or even suggests, that the Township ever detected any violation of its zoning code in connection with this well-publicized, and fully completed, remediation project. Therefore, we reject appellants' contention on this point.

In sum, we conclude that DEP properly issued the Permit to the University in compliance with all applicable statutory and regulatory requirements.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1684-14T2